COUNTY OF LOS ANGELES ET AL. *v.* DAVIS ET AL.

No. 77–1553.   Argued December 5, 1978—Decided March 27, 1979

BRENNAN, J., delivered the opinion of the Court, in which WHITE, MARSHALL, BLACKMUN, and STEVENS, JJ., joined. STEWART, J., filed a dissenting opinion, in which REHNQUIST, J., joined, *post*, p. 634. POWELL, J., filed a dissenting opinion, in which BURGER, C. J., joined, *post*, p. 636.

*William F. Stewart* argued the cause for petitioners. With him on the briefs was *John H. Larson.*

*A. Thomas Hunt* argued the cause for respondents. With him on the brief were *Timothy B. Flynn* and *Walter Cochran-Bond.*[*]

MR. JUSTICE BRENNAN delivered the opinion of the Court.

The District Court for the Central District of California determined in 1973 that hiring practices of the County of Los Angeles respecting the County Fire Department violated 42

[*]Briefs of *amici curiae* urging reversal were filed by *George Agnost, Burk E. Delventhal,* and *Diane L. Hermann* for the City and County of San Francisco; by *Stephen Warren Solomon* and *Ralph B. Saltsman* for the California Organization of Police and Sheriffs; and by *Robert E. Williams, Douglas S. McDowell,* and *Jeffrey A. Norris* for the Equal Employment Advisory Council.

Briefs of *amici curiae* urging affirmance were filed by *Bruce J. Ennis, Burt Neuborne, E. Richard Larson, Fred Okrand,* and *Paul Hoffman* for the American Civil Liberties Union et al.; by *Charles A. Bane, Thomas D. Barr, Norman Redlich, Robert A. Murphy, Norman J. Chachkin, Richard T. Seymour,* and *Richard S. Kohn* for the Lawyers' Committee for Civil Rights Under Law; and by *Jack Greenberg, O. Peter Sherwood,* and *Eric Schnapper* for the N. A. A. C. P. Legal Defense and Educational Fund, Inc.

Briefs of *amici curiae* were filed by *Robert A. Helman, Arnold Forster, Jeffrey P. Sinensky,* and *Richard A. Weisz* for the Anti-Defamation League of B'nai B'rith; by *Vilma S. Martinez, Morris J. Baller,* and *Joel G. Contreras* for the Incorporated Mexican American Government Employees et al.; and by *Ronald A. Zumbrun* and *John H. Findley* for the Pacific Legal Foundation.

U. S. C. § 1981.[1]  The District Court in an unreported opinion and order permanently enjoined all future discrimination and entered a remedial hiring order.  The Court of Appeals for the Ninth Circuit affirmed in part, reversed in part, and remanded the case for further consideration.  566 F. 2d 1334 (1977).  We granted certiorari to consider questions presented as to whether the use of arbitrary employment criteria, racially exclusionary in operation, but not purposefully discriminatory, violates 42 U. S. C. § 1981 and, if so, whether the imposition of minimum hiring quotas for fully qualified minority applicants is an appropriate remedy in this employment discrimination case.  437 U. S. 903 (1978).  We now find that the controversy has become moot during the pendency of this litigation.  Accordingly, we vacate the judgment of the Court of Appeals and direct that court to modify its remand so as to direct the District Court to dismiss the action.

## I

In 1969, persons seeking employment with the Los Angeles County Fire Department were required to take a written civil service examination and a physical-agility test.  Applicants were ranked according to their performance on the two tests and selected for job interviews on the basis of their scores.  Those who passed their oral interviews were then placed on a hiring-eligibility list.  Because blacks and Hispanics did poorly on the written examination, this method of screening job applicants proved to have a disparate impact on minority hiring.

The County of Los Angeles has not used the written civil

---

[1] Revised Stat. § 1977, 42 U. S. C. § 1981, provides:

"All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."

service examination as a ranking device since 1969. The county desisted, prior to the commencement of this litigation, because it felt that the test had a disparate adverse impact on minority hiring, because it feared that this impact might violate Title VII of the Civil Rights Act of 1964, 78 Stat. 253, as amended, 42 U. S. C. § 2000e *et seq.*, and because it wished, in any event, to increase minority representation in the Fire Department. See App. to Brief for Respondents 1–4.

In 1971, the county replaced the 1969 procedure with a new method of screening job applicants. A new written test was designed expressly to eliminate cultural bias. The test was to be given and graded on a pass-fail basis for the sole purpose of screening out illiterates. Five hundred of the passing applicants were to be selected at random for oral interviews and physical-agility tests. Passing applicants were to be ranked solely on the basis of the results of the physical-agility test and the oral interview. See 566 F. 2d, at 1346 (Wallace J., dissenting).

An examination was conducted, pursuant to this plan, in January 1972. Ninety-seven percent of the applicants passed the written test. There was no disparate adverse impact on minorities and this use of the written examination has not been challenged in this litigation.

After administration of the written test, but before the random selection could be made, an action was filed in state court against the county charging that the random-selection process violated provisions of the county charter and civil service regulations. The county was enjoined from using the random-selection method pending trial on the merits. See *ibid.*

For a time the hiring process came to a halt. The eligibility list drawn from the 1969 examination had been exhausted. The county was unable to devise a nonrandom method of screening job applicants and the county lacked the resources to interview all of the applicants who had passed the 1972 examination.

As a consequence of this unintended hiring freeze, vacancies in the County Fire Department increased and the manpower needs of the Department became critical. Finally, to break the logjam, the County Department of Personnel proposed to interview those applicants who had received the top 544 scores on the 1972 written test. Of this number, 492 were white, 10 black, and 33 Mexican-American. The applicants were not to be ranked on the basis of the test results, however, and the interviews were not intended to eliminate the remaining applicants from consideration. The purpose was solely to expedite the hiring of sufficient firefighters to meet the immediate urgent requirements of the Fire Department. See *ibid.* But when minority representatives objected to the plan, it was abandoned, uneffectuated, prior to the commencement of this litigation.

In January 1973, respondents, representing present and future black and Mexican-American applicants to the Fire Department, brought a class action against the County of Los Angeles, the Board of Supervisors of the County of Los Angeles, and the Civil Service Commission of the County of Los Angeles (petitioners). Respondents charged that petitioners' 1969 hiring procedures violated 42 U. S. C. § 1981. Respondents also charged that petitioners' plan to interview those applicants who had received the top 544 scores on the 1972 written test violated 42 U. S. C. § 1981.

The District Court found that petitioners had acted without discriminatory intent. Nonetheless, the District Court held that because the 1969 and 1972 written examinations had not been validated as predictive of job performance, petitioners' employment practices had violated 42 U. S. C. § 1981. The court permanently enjoined all future discrimination and mandated good-faith affirmative-action efforts. The court also entered a remedial hiring order whereby at least 20% of all new firefighter recruits were required to be black and another 20% were required to be Mexican-American until the

percentage of blacks and Mexican-Americans in the Los Angeles County Fire Department was commensurate with their percentage in Los Angeles County.[2]

The Court of Appeals reversed the District Court with respect to the 1969 examination: The Court of Appeals held that respondents did not have standing to seek relief on account of the 1969 civil service examination because the plaintiff class, as certified by the District Court, consisted only of present and future job applicants[3] and did not include any persons who had in any way been affected by the 1969 test.[4]

The Court of Appeals affirmed, however, the District

---

[2] Despite the fact that the Mexican-American population of Los Angeles County was approximately double the size of the black population, the District Court ordered identical accelerated hiring for both groups due to its finding that the Fire Department's 5'7'' height requirement for job applicants was a valid requirement for employment and that this height requirement had the effect of eliminating 41% of the otherwise eligible Mexican-American applicants from consideration. See 566 F. 2d 1334, 1337 (1977). The Court of Appeals reversed the District Court in this respect and ordered a relative increase in the Mexican-American hiring quota. In light of our disposition on grounds of mootness we do not consider this issue.

[3] Respondents contend that their failure to include past applicants in the class was a "mere oversight" which should not be used to vitiate the District Court's decree. But respondents did not cross petition for modification of the judgment of the Court of Appeals reversing the District Court with respect to the 1969 test. The issue of oversight, as a consequence, is not properly before us. See *FEA* v. *Algonquin SNG, Inc.*, 426 U. S. 548, 560 n. 11 (1976). We intimate no view whether respondents may seek, despite the oversight, to bring a new lawsuit with new and proper parties. See *Gibson* v. *Supercargoes & Checkers*, 543 F. 2d 1259, 1264 (CA9 1976).

[4] The parties stipulated that approximately 100 vacancies occur in the ranks of firemen each year, and testimony at trial established that 187 applicants were placed on an eligibility list following the 1969 test. Based on this evidence the Court of Appeals concluded that the 1969 list had been exhausted before plaintiffs applied for employment as firefighters in October 1971. See 566 F. 2d, at 1338.

Court's holding with respect to the 1972 proposal to use an unvalidated civil service examination.

## II

The only question remaining in this case, then, concerns petitioners' 1972 plan to interview the top 544 scorers on the 1972 written examination in order to fill temporary emergency manpower needs. We find that this controversy became moot during the pendency of this litigation.

"Simply stated, a case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Powell* v. *McCormack,* 395 U. S. 486, 496 (1969). We recognize that, as a general rule, "voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, *i. e.,* does not make the case moot." *United States* v. *W. T. Grant Co.,* 345 U. S. 629, 632 (1953). But jurisdiction, properly acquired, may abate if the case becomes moot because

(1) it can be said with assurance that "there is no reasonable expectation . . ." that the alleged violation will recur, see *id.,* at 633; see also *SEC* v. *Medical Committee For Human Rights,* 404 U. S. 403 (1972), and

(2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation. See, *e. g., DeFunis* v. *Odegaard,* 416 U. S. 312 (1974); *Indiana Employment Security Div.* v. *Burney,* 409 U. S. 540 (1973).

When both conditions are satisfied it may be said that the case is moot because neither party has a legally cognizable interest in the final determination of the underlying questions of fact and law.

The burden of demonstrating mootness "is a heavy one." See *United States* v. *W. T. Grant Co., supra,* at 632–633. Nevertheless, that burden is fully met on this record.

The first condition is met because there can be no reasonable expectation that petitioners will use an unvalidated civil

service examination for the purposes contemplated in 1972. Petitioners have not used an unvalidated written examination to rank job applicants since 1969. Petitioners considered employing such a procedure in 1972 only because of a temporary emergency shortage of firefighters and only because petitioners then had no alternative means of screening job applicants. Those conditions were unique, are no longer present, and are unlikely to recur because, since the commencement of this litigation, petitioners have succeeded in instituting an efficient and nonrandom method of screening job applicants and increasing minority representation in the Fire Department. The new procedures are as follows:

To fill each group of vacancies petitioners interview 500 applicants who passed their written examination, including the highest scoring 300 whites, 100 blacks, and 100 Mexican-Americans. The number interviewed is several times the number of actual vacancies. The interviewers rate each of these applicants on his or her merits without regard to race or national origin. Thereafter applicants are hired solely on the basis of the score given by the interviewer, again without regard to race or national origin. Those hired are not hired from separate lists, no quotas are used, and the same rating standards are applied to all applicants. The interviewers are not authorized to give extra points because of an applicant's race or national origin, but are directed only to be alert for talented minority applicants. This procedure has resulted every year since 1972 in a minority hiring level which consistently, though by varying amounts, exceeded 50%.

There has been no suggestion by any of the parties, nor is there any reason to believe, that petitioners would significantly alter their present hiring practices if the injunction were dissolved. See also Brief for N. A. A. C. P. Legal Defense and Educational Fund, Inc., as *Amicus Curiae* 7. *A fortiori,* there is no reason to believe that petitioners would replace their present hiring procedures with procedures that they re-

garded as unsatisfactory even before the commencement of this litigation. Under these circumstances we believe that this aspect of the case has "lost its character as a present, live controversy of the kind that must exist if '[the Court is] to avoid advisory opinions on abstract propositions of law." *Hall* v. *Beals,* 396 U. S. 45, 48 (1969).

The second condition of mootness is met because petitioners' compliance during the five years since 1973 with the District Court's decree and their hiring of over 50% of new recruits from minorities has completely cured any discriminatory effects of the 1972 proposal. Indeed, it is extremely doubtful, from this record, that the 1972 proposal had any discriminatory effects to redress. The plan, it must be remembered, was never carried out. As a consequence, there has been no finding that any minority job applicant was excluded from employment as a result of the proposal. Cf. *Franks* v. *Bowman Transportation Co.,* 424 U. S. 747 (1976).[5] Nor has there been a finding that any prospective minority job applicant was deterred from applying for employment with the Fire Department as a result of the proposed application of the examination. Cf. *Teamsters* v. *United States,* 431 U. S. 324, 365–367 (1977). Nor has there been a finding that the 1972 proposal reflected a racial animus that might have tainted other employment practices. Cf. *Keyes* v. *School Dist. No. 1, Denver, Colo.,* 413 U. S. 189 (1973). On the contrary the District Court expressly found:

"Neither Defendants nor their officials engaged in employment practices with a willful or conscious purpose of excluding blacks and Mexican-Americans from employment at the Los Angeles County Fire Department. To the contrary, several of Defendants' officials engaged

---

[5] Moreover, there appears to be no possibility that persons hired pursuant to the District Court's order will be terminated in consequence of our vacation of the Court of Appeals' judgment as moot. Cf. *DeFunis* v. *Odegaard,* 416 U. S. 312 (1974).

in efforts designed to increase the minority representation in the Los Angeles County Fire Department." App. 41.

All of these circumstances, taken together, persuade us that, whatever might have been the case at the time of trial, the controversy has become moot during the pendency of this litigation. Accordingly, we vacate the judgment of the Court of Appeals and remand to that court for entry of an appropriate order directing the District Court to dismiss the action as moot. See *United States* v. *Munsingwear, Inc.*, 340 U. S. 36, 39 (1950).[6]

*So ordered.*

Mr. Justice Stewart, with whom Mr. Justice Rehnquist joins, dissenting.

The Court of Appeals dealt with three alleged instances of discrimination by the petitioners in hiring firemen: a minimum-height requirement, the use of a written test in 1969 to establish hiring priorities, and the threatened reliance on the results of a test administered in 1972. The Court of Appeals ruled that the height requirement violated federal law. That ruling has not been challenged here. It concluded that these respondents did not have standing to challenge the 1969 test results. All Members of this Court agree. Thus, only the third claim remains in this case.

At least some of the respondents do have standing to challenge the threatened use of the 1972 test. They had applied for employment with the county in 1971 and took the 1972 test. Clearly, they would be affected by the county's decision to use the results of that test to select applicants for interviews. If the county's proposed use of the test was illegal, those respondents were threatened with injury in fact.

---

[6] Of necessity our decision "vacating the judgment of the Court of Appeals deprives that court's opinion of precedential effect . . . ." *O'Connor* v. *Donaldson*, 422 U. S. 563, 577–578, n. 12 (1975). See also *A. L. Mechling Barge Lines* v. *United States*, 368 U. S. 324, 329–330 (1961).

For the reasons expressed by Mr. Justice Powell, I believe that their controversy with the county is still alive.

I cannot agree with Mr. Justice Powell, however, that the § 1981 question is properly presented in this case. The respondents' second amended complaint alleged that the county had violated Title VII of the Civil Rights Act of 1964. The complaint included copies of "right to sue" letters from the Equal Employment Opportunity Commission. Title VII became applicable to local governmental units in March 1972. The county decided to use the 1972 test to rank applicants at the end of 1972. The District Court held that the county had violated both § 1981 and Title VII. The Court of Appeals expressly affirmed that decision.

> "Of course, this continued threat to use the 1972 test as part of the selection process right up to the filing of the complaint in this case is admittedly a violation of Title VII." 566 F. 2d 1334, 1341 n. 14.

Mr. Justice Powell concludes that the Court of Appeals did not make a considered judgment on the Title VII issue. While it is true that the text of the court's opinion dealt almost exclusively with § 1981, the court clearly held that Title VII standards apply to alleged violations of § 1981. Under the court's analysis, if a violation of § 1981 were made out and the conduct occurred while the defendant was covered by Title VII, Title VII must have been violated also. As the dissenting opinion in the Court of Appeals recognized, the decision on Title VII thus made completely unnecessary the court's discussion of whether § 1981 requires proof of discriminatory intent. 566 F. 2d, at 1347.

The petitioners did not question the ruling of the Court of Appeals on the Title VII claim,* and any opinion this Court

---

*The second question presented in the petition for certiorari does bear on Title VII, but not in a sense relevant to this question:

"Is a racial quota hiring order to be effective until the entire fire

might render on the § 1981 question would not affect the judgment below that petitioners' action was illegal under Title VII. Thus, it would truly be an advisory opinion.

It is clear, however, that the only violation remaining in this case, the threatened use of the 1972 test to rank job applicants, cannot justify the extensive remedy ordered by the District Court. "As with any equity case, the nature of the violation determines the scope of the remedy." *Swann* v. *Charlotte-Mecklenburg Bd. of Educ.*, 402 U. S. 1, 16. A simple order enjoining the illegal use of the 1972 test would seem sufficient to remedy the only violation of which the respondents had standing to complain. Therefore, I would vacate the judgment of the Court of Appeals and remand the case to the District Court with directions to narrow the scope of the remedy substantially.

MR. JUSTICE POWELL, with whom THE CHIEF JUSTICE joins, dissenting.

Today the Court orders dismissal of a suit challenging the hiring practices of the Los Angeles County Fire Department.

---

department achieves current racial parity with the general population beyond the jurisdiction of the court when:

.        .        .        .        .

"c. The plaintiffs had no standing to represent any pre-March 24, 1972 applicants and no discriminatory *hiring* has occurred subsequent to Title VII's effective date." (Emphasis added.)

This does not challenge the holding of the Court of Appeals that the threatened use of the 1972 test was itself a Title VII violation, nor, in fact, does it challenge any finding of violation at all. Rather, it is addressed solely to the remedy.

In their brief the petitioners argue that the mere threat to use the test results to rank applicants cannot constitute a violation of Title VII and that a pattern or practice of discrimination must be shown. They also urge that Title VII cannot be applied to local governmental units absent some showing of discriminatory intent. See *Dothard* v. *Rawlinson*, 433 U. S. 321, 323 n. 1; *Hazelwood School Dist.* v. *United States*, 433 U. S. 299, 306 n. 12. Because these issues were not raised in the petition for certiorari, it is unnecessary to address them.

The dismissal is predicated on the view that the case has become moot. This disposition of the case is opposed by petitioners, and is not urged by respondents either in their briefs or oral argument. But apart from this, I believe the Court's decision misapplies settled principles of mootness, and think the case is properly before us. We should reach, rather than seek a questionable means of avoiding, the important question—heretofore unresolved by this Court— whether cases brought under 42 U. S. C. § 1981, like those brought directly under the Fourteenth Amendment, require proof of racially discriminatory intent or purpose.

This suit was brought to eliminate the effects of alleged racial discrimination in the Los Angeles County Fire Department. The plaintiffs, respondents here, were persons who applied unsuccessfully for fireman jobs in 1971; the class they represented was certified to include present and future, but not past, black and Mexican-American job applicants to the Fire Department. The county was accused of a variety of employment practices said to discriminate against minorities, including the use of "written tests as a promotion and hiring selection device" even though the tests had "disproportionate detrimental impact" on blacks and Mexican-Americans. App. 4. The named plaintiffs had taken the most recent of these tests, which was administered in January 1972. The use of the tests, together with other actions of the county that plaintiffs described as discriminatory,[1] was alleged to be re-

---

[1] The complaint also alleged that Fire Department personnel had engaged in nepotistic and "word-of-mouth" recruitment, employed a discriminatory interview procedure, used other procedures, practices, and standards that disfavored minorities, and refused to take affirmative action to correct the effects of past discrimination. App. 4–5. The District Court found that the written tests and the Department's failure to take affirmative steps to overcome a reputation of discrimination among blacks and Mexican-Americans constituted illegal discrimination, but held that the use of a 5'7" height requirement for firemen was job related and not discriminatory. *Id.*, at 39. The opinion of the Court of Appeals relied

sponsible for substantially fewer blacks and Mexican-Americans being employed by the Fire Department than were present in the population it served.

The District Court found that the county had engaged in employment discrimination and imposed a comprehensive racially based hiring order.[2] In granting this relief, the court apparently acted under the assumption that the plaintiff class had standing to attack acts of discrimination that occurred before any of the class members applied for employment in 1971. The Court of Appeals for the Ninth Circuit reversed this determination. As no past applicants were included in the plaintiff class, the court held that respondents could not challenge the legality of employment practices which had no effect on post-1971 hiring. Respondents therefore were held to lack standing to challenge the civil service test administered in 1969, as the list of eligible applicants drawn up on the basis of that test had been exhausted before any of the class members had sought employment. 566 F. 2d 1334, 1337–1338 (1977). A majority of the panel nonetheless affirmed the District Court's hiring order. *Id.,* at 1343–1344.

Respondents have not sought review of the determination of standing by the court below. Accordingly, the county's

entirely on the county's written examinations as the basis for sustaining the District Court's remedial order. 566 F. 2d 1334, 1342–1344 (1977).

In addition, the Court of Appeals reversed as clearly erroneous the finding that the height requirement was job related and suggested that the District Court could take further steps to offset the allegedly discriminatory effect of this standard. *Id.,* at 1341–1342, 1343. Petitioners have not sought review of that question; rather they contend that the court below applied the wrong legal standards in assessing generally the legality of their employment practices.

[2] The order required the county to select a minimum of 20% of its new firemen from black applicants and another 20% from Mexican-American applicants until the percentage of members of these racial groups in the fireman work force equaled the percentages in the general population of the county. The county also was required to file annual reports with the court on fireman hiring.

use of the 1972 test is the only employment practice now before us. This narrows the controversy considerably from its original dimensions, but it does not follow that a case or controversy between the county and respondents no longer exists. This is evident from a review of the facts.

The 1972 test was the same as the one administered in 1969, except that some attempt had been made to screen out questions thought to reflect cultural bias. After grading the test, the county announced it would interview only the 544 applicants with the highest scores, rather than the 2,338 applicants who achieved a passing score. On January 8, 1973, five days after interviews began, the county changed its plans and decided to interview all applicants who had passed.[3] Respondents filed this suit on January 11, 1973. In their second amended complaint, filed on April 16, 1973, respondents alleged that the county decided not to use the 1972 test as a screening device only because suit was about to be filed, App. 5, and that the county would reinstitute such use unless an injunction were issued, id., at 7. The District Court found that the 1972 test was among the discriminatory employment practices in which the county engaged,[4] and that the county had dropped its plan to tie interviews to test performance because of the then pending suit. Id., at 39.

The court below agreed that the county's attempt to use the 1972 test as a selection device "had an adverse impact on the

---

[3] A stipulation signed by the parties in the District Court incorrectly stated that the change in plans took place on January 8, 1972. It is clear from the face of the stipulation, however, that the 1973 date was meant: The county could not have scheduled interviews to take place on or after January 3, 1972, on the basis of a test administered some time in January 1972. No party has contended here that the 1972 date was correct.

[4] According to the stipulated facts, 19.8% of the applicants who took the 1972 test were black or Mexican-American, but only 8.9% of those 544 applicants who initially were scheduled for interviews were minority group members.

racial class of plaintiffs." 566 F. 2d, at 1338 n. 6. In its view, respondents therefore had standing to attack this conduct. After determining what it considered to be the proper standard for liability under § 1981, the court held that "the district court properly found defendants' use of the 1972 written examination as a selection device to be a violation of § 1981." 566 F. 2d, at 1341. Turning to the scope of the relief ordered, a majority of the panel expressed its approval of the District Court's remedial order. Looking at the judicial "power under § 1981," *id.*, at 1342, the majority ruled that "the district court properly exercised its discretion in ordering affirmative action to be undertaken to erase the effects of past discrimination." *Id.*, at 1343.[5]

In addition to requiring an affirmative employment program to achieve specified racial percentages in hiring, the District Court ordered that petitioners "are permanently enjoined and restrained from engaging in any employment practice which discriminates on the basis of race or national origin against the class represented by Plaintiffs in this Action . . . ."

---

[5] MR. JUSTICE STEWART agrees that the case is not moot, but argues that the § 1981 issue is not properly presented in this case. He thinks the court below also rested its holding on a finding that petitioners' conduct violated Title VII of the Civil Rights Act of 1964. While the matter is not free from doubt, it seems most unlikely that the court below based its affirmance of the District Court's sweeping injunction on its cryptic and offhand conclusion that "[o]f course" the "continued threat" to base hiring on test performance "is admittedly a violation of Title VII," 566 F. 2d, at 1341 n. 14. As the language quoted in the text illustrates, the court grounded its decision expressly on § 1981. The one-sentence reference to Title VII is divorced from any discussion of the relationship between the purported violation and the relief granted. Although the basis of the court's affirmance of the injunction is not clear, see 566 F. 2d, at 1342–1344, it apparently believed the District Court properly took into account pre-Title VII violations of § 1981 in determining the scope of the remedial order, in spite of respondents' lack of standing to seek relief for themselves. Thus, the decision of the Court of Appeals seems to have been based on a conclusion that independent violations of § 1981 had occurred.

App. 45. If the District Court was correct, as the court below held, in ruling that the *threatened* use of the 1972 test was an employment practice that discriminated on the basis of race, then an order to prevent the county from carrying out its threat would have been appropriate. The fact that wrongful conduct has not yet transpired does not leave a court powerless to prevent the threatened wrong, if the likelihood of harm is sufficiently substantial. *Doran* v. *Salem Inn, Inc.,* 422 U. S. 922, 930–932 (1975); *Steffel* v. *Thompson,* 415 U. S. 452, 458–460 (1974); *Doe* v. *Bolton,* 410 U. S. 179, 188 (1973). Cf. *Warth* v. *Seldin,* 422 U. S. 490, 499 (1975); *Linda R. S.* v. *Richard D.,* 410 U. S. 614, 617 (1973).[6]

The Court nonetheless holds that this case has become moot, because "there can be no reasonable expectation that petitioners will use an unvalidated civil service examination for the purposes contemplated in 1972," *ante,* at 631–632. This assumption is contrary to findings of fact by the courts below, is opposed by the parties who are subject to the order to be dismissed, and manifestly is at odds with the record in this case.

Neither of the courts below regarded the county's planned use of the 1972 test as solely a response to what the Court characterizes as a "temporary emergency shortage of firefighters." *Ante,* at 632. The District Court, in assessing whether petitioners' announced intention to use the 1972 test as a

---

[6] Petitioners challenged the standing of respondents to seek the relief that was granted. The court below rejected this challenge in part, holding that respondents could attack the threatened use of the 1972 test. 566 F. 2d, at 1338 n. 6; *id.,* at 1347 n. 2 (Wallace, J., dissenting). The Court approves this holding today. *Ante,* at 631. I agree that respondents alleged injuries in fact, and sought relief, adequate to meet our standing requirements, even though they lacked standing to seek all of the relief accorded them by the courts below. See *Nyquist* v. *Mauclet,* 432 U. S. 1, 6 n. 7 (1977); *Arlington Heights* v. *Metropolitan Housing Dev. Corp.,* 429 U. S. 252, 261–264 (1977); *Simon* v. *Eastern Kentucky Welfare Rights Org.,* 426 U. S. 26, 41–42 (1976); *Warth* v. *Seldin,* 422 U. S., at 498–502; *Linda R. S.* v. *Richard D.,* 410 U. S., at 617. Cf. *East Texas Motor Freight Systems, Inc.* v. *Rodriguez,* 431 U. S. 395, 404 (1977).

selection device violated § 1981, found that this lawsuit was responsible for the county's change in hiring procedures from interviewing only high scorers to considering everyone who passed the test. App. 39. The Court of Appeals agreed, and held: "[Petitioners'] decision, prompted solely by the filing of this lawsuit, to abandon the written exam as a selection device does not moot the claim." 566 F. 2d, at 1341.

Nor have petitioners altered their position on the legality of their use of testing since the decision below. Rather, petitioners strongly assert that the controversy is still a live one. The only suggestion of mootness that has been raised in this case comes from the N. A. A. C. P. Legal Defense and Educational Fund, an organization which is an *amicus curiae* here but has not participated previously in this litigation. Petitioners have attacked this assertion and the factual assumptions on which it rests:

> "The NAACP in reliance on statements of fact that appear absolutely nowhere in the record, gratuitously advance the novel theory that the petitioners have not been hiring under compulsion of the quota order since it was entered in 1973. This contention is not only irrelevant to the issue of the validity of the quota order, but is simply not correct. The *amicus'* factual representation itself describes a quota when it states that all applicants are reduced down to three groups of whites, blacks and Mexican-Americans in exact proportion to the 1–1–3 hiring order." Reply Brief for Petitioners 20 n. 7.

Petitioners continue to use civil service examinations as a threshold barrier for employment consideration, and the record is silent on their validation. To comply with the District Court's order, petitioners have added additional steps to the hiring process to take account of the race of the applicants. The test scores of applicants are ranked separately within each racial group, and the highest scorers are selected for

interviews in the exact racial proportions specified by the court order. Among those applicants who receive an interview, preference is given to minority group members. But these steps clearly are the product of the injunction at issue here and do not represent, as the Court's opinion states, a voluntary affirmative-action program.

. The fact that the county, upon pain of contempt, has substantially altered its use of examinations by the addition of other steps that take account of applicants' race hardly can support a finding that "there is no reasonable expectation" the county will abandon its additional procedures once the court order requiring them is dismissed. Our previous decisions make clear that a case does not become moot simply because a court order redressing the alleged grievance has been obeyed. *NLRB* v. *Raytheon Co.,* 398 U. S. 25 (1970); *NLRB* v. *Pennsylvania Greyhound Lines, Inc.,* 303 U. S. 261, 271 (1938). In *United States* v. *W. T. Grant Co.,* 345 U. S. 629 (1953), on which the court below relied and which the Court today attempts to distinguish, it was stated:

> "Both sides agree to the abstract proposition that voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, *i. e.,* does not make the case moot. *United States* v. *Trans-Missouri Freight Assn.,* 166 U. S. 290 (1897); *Walling* v. *Helmerich & Payne, Inc.,* 323 U. S. 37 (1944); *Hecht Co.* v. *Bowles,* 321 U. S. 321 (1944). A controversy may remain to be settled in such circumstances, *United States* v. *Aluminum Co. of America,* 148 F. 2d 416, 448 (1945), *e. g.,* a dispute over the legality of the challenged practices. *Walling* v. *Helmerich & Payne, Inc., supra; Carpenters Union* v. *Labor Board,* 341 U. S. 707, 715 (1951). The defendant is free to return to his old ways. This, together with a public interest in having the legality of the practices settled, militates against a mootness conclusion. *United States* v. *Trans-Missouri*

*Freight Assn., supra,* at 309, 310. For to say that the case has become moot means that the defendant is entitled to a dismissal as a matter of right, *Labor Board* v. *General Motors Corp.,* 179 F. 2d 221 (1950). The courts have rightly refused to grant defendants such a powerful weapon against public law enforcement.

"The case may nevertheless be moot if the defendant can demonstrate that 'there is no reasonable expectation that the wrong will be repeated.' The burden is a heavy one. Here the defendants told the court that the interlocks no longer existed and disclaimed any intention to revive them. *Such a profession does not suffice to make a case moot* although it is one of the factors to be considered in determining the appropriateness of granting an injunction against the now-discontinued acts." *Id.,* at 632–633 (footnotes omitted; emphasis supplied).[7]

In my view, there is far less to the mootness issue here than to that presented in *W. T. Grant Co.* Petitioners, the subject of the lower court's injunction, hotly dispute any suggestion that no live issues remain. Furthermore, they did not cease voluntarily their allegedly illegal conduct and have not disclaimed an intention to resume their use of civil service tests as a primary hiring criterion.[8] Nor, in light of this

---

[7] As we further observed in *United States* v. *Oregon State Medical Soc.,* 343 U. S. 326, 333 (1952), "[i]t is the duty of the courts to beware of efforts to defeat injunctive relief by protestations of repentance and reform, especially when abandonment seems timed to anticipate suit, and there is probability of resumption."

[8] Los Angeles, along with the city of San Diego, filed an *amicus* brief in a case before this Court which involved personnel testing. In their statement of interest, these *amici* declared:

"The Cities of Los Angeles and San Diego are municipal corporations within the State of California. The interests of those cities arise from their positions as public sector employers which have charter requirements to hire individuals based on merit. Pursuant to merit principles, both

record, could a disclaimer—were it made—satisfy the "heavy burden" imposed upon a defendant seeking to have a suit dismissed as moot.[9]

cities use various personnel tests to hire and to promote individuals in the classified civil service.

   .       .        .        .        .

"Thus, both cities before this Court as Amici Curiae have interests in maintaining personnel testing programs to fulfill the merit system requirements of their municipal charters, as well as interests in sustaining those personnel tests in litigation." Brief for City of Los Angeles et al. as *Amici Curiae* in *Detroit Edison Co.* v. *NLRB*, O. T. 1978, No. 77–968, pp. 2, 4.

[9] The assertion of the Court that "there can be no reasonable expectation" that petitioners will base hiring on unvalidated aptitute tests, *ante*, at 631, lacks any record support and is contrary to the assumptions upon which the courts below based their actions. There has been no change in circumstances of any relevance to the Court's conclusion since petitioners attempted to use their unvalidated 1972 test as a hiring device. Title VII, which the Court appears to suggest as an intervening factor, applied with full force to petitioners when in January 1973 they sought to limit hiring to applicants with the highest scores on the 1972 test. Under *W. T. Grant Co.*, the burden is on petitioners to demonstrate that there is little chance they will resume their allegedly illegal conduct. Petitioners have not attempted to meet that burden here. The Court's assumption that in the future the county will seek to validate its tests before relying on them not only is unsubstantiated by the record facts, it also reverses the presumption we normally apply in mootness cases. See, *e. g., Hampton* v. *Mow Sun Wong,* 426 U. S. 88, 98, and n. 14 (1976) (federal agency's new hiring regulation forbidding challenged practice does not moot claim for injunctive and declaratory relief).

It is instructive to compare the facts of this case with those of *DeFunis* v. *Odegaard,* 416 U. S. 312 (1974). Here petitioners have made no change in their hiring procedures except in response to the court order, and have put on this record no evidence that they contemplate any further changes. The Court's belief that petitioners will not resume their use of unvalidated tests rests solely on speculation. In *DeFunis,* by contrast, the law school had admitted DeFunis to his final quarter in school and represented to this Court that it would make no attempt to rescind this registration. Unlike the case at bar, DeFunis had not brought a class action; hence only his individual right not to be discriminated against in law school admissions was at stake. *Id.,* at 317. Because it was virtually certain

Furthermore, the Court's avoidance of the merits of this controversy by its novel view of mootness leaves the county in a quandary. Although it is not unreasonable to assume, following dismissal of this suit as moot, that the county will again base hiring on unvalidated aptitude tests, it also is possible that the county may believe that hiring procedures of the sort previously required by the order under review are necessary to ensure compliance with federal law. The Court's disposition today will leave the decision of the Court of Appeals on the merits as the most pertinent statement of the governing law, even if that decision is not directly binding.[10] Therefore, any future litigation against the county, including the suit to assert the rights of pre-1971 applicants that the Court seems to contemplate, *ante,* at 630 n. 3, is likely to be controlled by the decision of that court.

In sum, the Court's disposition leaves all of the parties in positions of uncertainty: Respondents lack protection against the resumption of the county's alleged discrimination, and the county lacks a conclusive determination of the legality of its conduct. All of these considerations militate against a determination of mootness. See *Vermont Yankee Nuclear Power Corp.* v. *Natural Resources Defense Council, Inc.,* 435 U. S. 519, 535–537, n. 14 (1978). Accordingly, I conclude that the question of whether petitioners violated § 1981 is before

---

that DeFunis never again would need to submit to the admission process he challenged, we held that the case had become moot. *Id.,* at 318. Even the very slight chance that DeFunis might not receive his degree was considered sufficiently substantial by four Members of the Court to render the case a live controversy.

[10] Although a decision vacating a judgment necessarily prevents the opinion of the lower court from being the law of the case, *O'Connor* v. *Donaldson,* 422 U. S. 563, 577–578, n. 12 (1975); *A. L. Mechling Barge Lines* v. *United States,* 368 U. S. 324, 329–330 (1961); *United States* v. *Munsingwear, Inc.,* 340 U. S. 36 (1950), the expressions of the court below on the merits, if not reversed, will continue to have precedential weight and, until contrary authority is decided, are likely to be viewed as persuasive authority if not the governing law of the Ninth Circuit.

us.[11]   I would reach this issue and determine whether § 1981, like the Equal Protection Clause of the Fourteenth Amendment, prohibits only purposefully discriminatory conduct.[12]

---

[11] I cannot agree with MR. JUSTICE STEWART that the question whether petitioners had violated § 1981 in the past was a matter of indifference to the court below and would be immaterial upon remand. See n. 5, *supra*. In exercising its "broad" equitable discretion as to granting any prophylactic relief, see *United States* v. *W. T. Grant Co.*, 345 U. S. 629, 633 (1953), the District Court could consider whether the county's conduct was a single, isolated instance of illegality or part of a pattern of unlawful conduct. This would rest on a determination of the requirements of § 1981 prior to the 1972 amendment of Title VII. Thus, a decision now on the § 1981 issue could affect the substantial rights of the parties and would not be an advisory opinion.

[12] I am in agreement with MR. JUSTICE STEWART that, regardless of the proper construction of § 1981, the only arguably illegal conduct in this case could not justify the sweeping remedy ordered by the District Court.