The **VILLAGE OF ILION, NEW YORK, Municipal Building,** Ilion, New York 13357, Petitioner,

v.

**FEDERAL ENERGY REGULATORY COMMISSION, 825 North Capital Street, N.E., Washington, D.C. 20426, Respondent.**

Power Authority of the State of New York, Niagara Mohawk Power Corporation, New York State Electric & Gas Corporation, Intervenors.

No. 636, Docket 85–4143.

United States Court of Appeals, Second Circuit.

Argued Feb. 6, 1986.

Finally Submitted March 6, 1986.

Decided May 5, 1986.

Philip L. Chabot, Jr., Washington, D.C., for petitioner.

Joshua Z. Rokach, Atty., F.E.R.C., Washington, D.C. (William H. Satterfield, General Counsel, Jerome M. Feit, Solicitor, F.E.R.C., Washington, D.C., of counsel), for respondent.

Kenneth M. Jasinski, New York City (Frederic H. Lawrence, Huber Lawrence & Abell, New York City, for intervenor New York State Elec. & Gas Corp.; Jaeckle, Fleischmann & Mugel, John H. Stenger, Buffalo, N.Y., of counsel, for intervenor Niagara Mohawk Power Corp.

Before FEINBERG, Chief Judge, and MANSFIELD and CARDAMONE, Circuit Judges.

MANSFIELD, Circuit Judge:

The Village of Ilion ("Ilion") seeks review of an order of the Federal Energy Regulatory Commission ("FERC") dismissing as moot a complaint and petition filed by it jointly with the Municipal Electric Utilities Association ("MEUA"). The complaint sought a declaratory order from

FERC stating that the Power Authority of the State of New York ("PASNY") had engaged in anticompetitive conduct in violation of the federal antitrust laws, the Niagara Redevelopment Act, 16 U.S.C. § 836, *et seq.*, the Federal Power Act, 16 U.S.C. § 791a, *et seq.*, and PASNY's license from FERC. The Niagara Redevelopment Act ("NRA") entitles PASNY's "preference customers" (municipalities, such as Ilion, and non-profit cooperatives) to purchase their reasonably foreseeable power needs from PASNY up to 50% of the output of the Niagara Power Project. PASNY is authorized to sell the balance of the Project's power output to privately owned utilities.

In 1979 Ilion and MEUA initiated a FERC proceeding in which they claimed PASNY was not providing the power allotted to them by the NRA. The agency divided the proceeding into two "hearing phases". Phase I considered how much power the NRA required PASNY to supply to its preference customers. The present complaint and petition were part of Phase II, which considered the claim of Ilion and MEUA that PASNY engaged in anti-competitive conduct by limiting the preference customers' access to Niagara Project power. FERC concluded that the present complaint was rendered moot by its orders, affirmed as modified in *Power Authority of State of New York v. F.E.R.C.*, 743 F.2d 93 (2d Cir.1984), resolving Phase I.[1] We affirm, but without prejudice to Ilion's right to request that PASNY reallocate among its preference customers the Niagara Project power that it is required by the NRA to sell to such customers.

## BACKGROUND

PASNY is licensed by FERC to administer the Niagara Power Project ("the Project"), which generates hydroelectric power from the Niagara River near Niagara Falls. PASNY's license and the NRA, 16 U.S.C. §§ 836, 836(a), which created the Project, require that in disposing of 50% of the power generated by the Project PASNY must give preference to publicly-owned utilities or cooperative electric systems ("preference customers") over private, investor-owned utilities. The NRA also requires that if PASNY should sell more than 50% of the Project's power production to privately owned utilities it must "make flexible arrangements ... providing for the withdrawal upon reasonable notice and fair terms of enough power to meet the reasonably foreseeable needs of the preference customers" up to 50% of the power generated by the Project. 16 U.S.C. § 836(b)(1).

Ilion owns and operates a municipal electric utility which distributes electric power to retail customers. It is one of PASNY's preference customers and a member of MEUA. Like many MEUA members, Ilion receives the Niagara Project power it buys from PASNY over the transmission lines of Niagara Mohawk Power Corporation, one of PASNY's three distributors, known as "wheeling agents." PASNY's other two wheeling agents are New York State Electric & Gas Corporation and Rochester Gas and Electric Corporation.[2] The three wheeling agents are the same privately owned utilities which purchase Niagara Project power that is not sold to preference customers. Since MEUA members resell power to customers within the same distribution network, the private utilities and

---

**1.** The Orders resolving Phase I were:

    (1) Initial Decision of the Presiding Administrative Law Judge (Oct. 22, 1980);

    (2) Opinion No. 151, Declaratory Opinion And Order Affirming With Modifications Initial Decision on Niagara Preference, 21 FERC (CCH) ¶ 61,021 (Oct. 13, 1982);

    (3) Opinion No. 151-A Opinion And Order On Rehearing Modifying Declaratory Opinion And Order On Niagara Preference With Respect To The Remedy, 23 FERC (CCH) ¶ 61,031 (April 6, 1983);

    (4) Supplemental Opinion Explaining Denial of MEUA Motion, 23 FERC (CCH) ¶ 61,064 (April 12, 1983);

    (5) Order Granting Declaratory Relief, Denying In Part And Granting In Part Rehearing, Modifying Opinion No. 151, And Clarifying Opinion No. 151–A, 23 FERC (CCH) ¶ 61,302 (May 27, 1983).

**2.** The three private utilities are intervenors in the present suit.

preference customers to some extent compete for certain retail customers.

On May 12, 1978, MEUA filed a complaint with FERC alleging that PASNY was violating its license and the NRA by refusing to supply the preference customers with 50% of the Niagara Project power output. As explained in our earlier decision in this proceeding, *Power Authority of the State of New York v. F.E.R.C.*, 743 F.2d 93 (2d Cir.1984) ("*Power Authority*"), the complaint stemmed from the fact that when the Project was completed in 1961 PASNY estimated the preference customers' demand for Project power through 1985, contracted with the preference customers to supply those estimated needs, and sold the remainder of the Project power, through January 1, 1990, to private utilities for resale to their customers. PASNY's contracts with the private utilities entitled it to withdraw for sale to preference customers, if demanded by them, such amounts of power as might be needed to meet the reasonably foreseeable needs of the preference customers, as estimated in 1960–61. Based on the 1960–61 estimates of the preference customers' foreseeable future needs the power subject to these withdrawal provisions, when combined with the percentage of Project power already being sold to preference customers, was substantially less than 50% of the Project's total output and turned out to be substantially less than the power eventually demanded by the preference customers.

By the time MEUA filed its complaint, the preference customers were using all the power PASNY had contracted to sell them in the early 1960's, plus the power PASNY had initially sold to the private utilities on a withdrawable basis, and were demanding more. MEUA's complaint alleged that "PASNY was obligated by the terms of its license to furnish preference customers with up to 50% of the Niagara Project's capacity despite its 1961 forecast and entry into long-term contracts to furnish a portion of that 50% to non-preference utilities until 1990." *Power Authority, supra*, 743 F.2d at 100.

Ilion filed a separate complaint and petition for a declaratory order with FERC in August 1978. Ilion's complaint reiterated MEUA's claim that PASNY was violating the NRA by failing to provide 50% of the Niagara Project Power to its preference customers. It also alleged that PASNY was refusing to sell Niagara Project power to preference customers for resale to industries which were already served by privately owned utilities.

Ilion claimed that PASNY's policies subjected it to a severe and immediate impact by preventing it from providing power to a Remington Arms factory situated in Ilion. The factory normally received its power from Niagara Mohawk, a private utility that is one of PASNY's wheeling agents. In February 1978 Ilion concluded that it could furnish Niagara Project power to the Remington Arms factory more cheaply than could Niagara Mohawk and requested an additional allocation of Niagara power from PASNY to allow it to do so. PASNY rejected the request in May 1978 on the grounds that "no hydro-electric power generated within the State of New York by PASNY is currently available." Ilion's complaint alleged that PASNY's refusal to sell Ilion the power requested by it was part of a conspiracy with Niagara Mohawk in restraint of trade and an illegal refusal to deal, given PASNY's "monopoly control over hydroelectric projects located on the Niagara River and St. Lawrence Seaway." Ilion requested that FERC order PASNY to "make available to preference entities at least 50 per cent of the power and energy generated at the Niagara Project" and to "allocate sufficient Niagara Project Power and energy to Ilion to meet all of its needs, including an amount sufficient for Ilion to serve Remington Arms until such time as the combined preference entity loads are equal to at least 50 per cent of the power and energy generated at the Niagara Project."

FERC consolidated the Ilion and MEUA complaints in November 1978 in an *Order Granting in Part and Denying in Part Motions for Summary Disposition, Pro-*

*viding for Expedited Hearing, and Consolidating Proceedings*, 9 FERC (CCH) ¶ 61,128 (Nov. 2, 1979). At the same time it denied a request by PASNY summarily to dismiss the claims of anticompetitive conduct, but, finding that the allegations made by MEUA and Ilion were overly general, required them to "file preliminary statements setting forth in greater detail their specific allegations of anticompetitive behavior, the evidence intended to be adduced to prove the allegations", the laws allegedly violated, the specific relief requested and the Commission's authority to grant that relief. *Id.* at p. 61,251. Finally, FERC ordered that the case be heard by an Administrative Law Judge to determine whether PASNY had violated the relevant laws. Noting that "proceedings involving allegations of anticompetitive behavior can be very complex and time consuming", FERC instructed the ALJ to conduct hearings on the claims asserted by Ilion and MEUA in two phases. In Phase I, he was to consider the claim that PASNY was not selling preference customers all the preference power to which they were entitled, and in Phase II, the anti-trust allegations. *Id.* at p. 61,251.

MEUA and Ilion filed a more detailed statement of their Phase II allegations on December 3, 1979. In it they alleged that PASNY was engaged in various types of anticompetitive conduct: (1) PASNY was refusing to sell power to preference customers for resale to industries already served by private power companies; (2) PASNY had conspired with the private utilities engaged in wheeling Niagara Project power to preference customers to give those utilities the authority and means to restrict the preference customers' access to Niagara power, such as by limiting transmission services to territories and preference customers served in 1961, and authorizing the private utilities unilaterally to designate the voltage levels and delivery points of power they wheeled to preference customers and to require the preference customers to bear the cost of extending service lines from the point of delivery, or interconnection, to the customers' electric receiving substations; and (3) PASNY engaged in anticompetitive conduct by dictating to preference customers that they would receive nuclear, rather than hydroelectric, power. These types of anticompetitive acts were alleged to constitute a per se illegal restriction on sale of power for resale, a per se illegal territorial division, an abuse of monopoly power by PASNY, and an illegal tying of "access to PASNY power to acceptance of restrictive provisions" in violation of the Sherman and Clayton Acts. 15 U.S.C. § 1, *et seq.*

MEUA and Ilion requested three forms of relief. First, they asked FERC to declare PASNY's "policy of refusing to allocate Niagara Project power to preference customers for resale to industries presently served by private power companies" to be a violation of the NRA, PASNY's license to run the project and of the Federal Power Act, 16 U.S.C. § 791a *et seq.* Second, they asked FERC to declare the "restrictive contract provisions" in PASNY's contracts with its private wheeling agents null and void; and third, they requested that FERC require PASNY to "make available ... Niagara Project power to serve the needs of preference customers on reasonable terms and conditions."

Administrative Law Judge Bruce Birchman presided over both Phase I and Phase II. After hearing extensive testimony he issued a decision on Phase I on October 22, 1980, voiding PASNY's contracts with the private utilities. His decision, and the FERC orders which substantially modified it, are fully described in *Power Authority, supra,* which modified and affirmed the FERC orders. In *Power Authority,* we concluded that the NRA only required that PASNY sell Niagara Project power equal to the reasonably foreseeable needs of the preference customers as predicted in 1960, and that PASNY had met this obligation through June 30, 1985 by supplying its preference customers with Niagara Project power and similarly priced hydroelectric power from another source, the St. Lawrence Project. We also found, however, that PASNY had not contracted to sell the

preference customers enough Niagara power to cover their "reasonably foreseeable" needs for the period from June 30, 1985 to January 1, 1990 and, accordingly, ordered it to increase its sales to 697.53 megawatts (MW) by 1989. Unlike the ALJ and FERC, we did not entirely void PASNY's contracts with the private utilities, but allowed PASNY to provide the additional preference power from sources other than the Niagara Project, provided it charged the same price for such power as it charged for Niagara Project power.

Two aspects of the Phase I decisions are particularly important for Phase II. Both FERC and this court rejected PASNY's claim that the NRA and the FERC license to PASNY only obligated PASNY to furnish preference power to municipal utilities for resale to "domestic and rural customers" and not to industrial users. *Power Authority, supra,* 743 F.2d at 104–07. We approved FERC's order that PASNY sell power to preference customers regardless of whether they resold it to industrial users. *Opinion 151–A; Opinion and Order on Rehearing Modifying Declaratory Opinion and Order on Niagara Preference with Respect to the Remedy,* 23 FERC (CCH) ¶ 61,031 at p. 61,081–82 (April 6, 1983). FERC also found, in *Opinion 151; Declaratory Opinion and Order Affirming with Modification Initial Decision on Niagara Preference,* 21 FERC (CCH) ¶ 61,021 at p. 61,149 (Oct. 13, 1982), and reaffirmed in *Opinion 151–A, supra,* at p. 61,080–81, that PASNY's contracts with the private utilities were void in so far as they restricted the preference customers' use of the preference power by limiting the wheeling of preference power to parties which were preference customers in 1961 or to areas served at that time. We affirmed that portion of the order without comment. *Power Authority, supra,* 743 F.2d at 98.

Though the Phase I decisions increased the amount of Niagara Project power or similarly-priced power allocated to the preference customers, their demand for preference power exceeded the amount to be supplied. Ilion, therefore, has to date not received the 7 MW of additional power it has sought for resale to the Remington Arms plant.

The ALJ issued his ruling on Phase II in December 1980. He held that MEUA and Ilion's claim that PASNY's contracts with the private utilities were anti-competitive was mooted by his decision in Phase I, in which he had voided those contracts, and that MEUA and Ilion had failed to prove the remainder of their allegations against PASNY. MEUA and Ilion appealed the decision to FERC. FERC ruled in February 1985 that the entire Phase II complaint was moot because the Phase I decisions granted MEUA and Ilion the relief they sought in Phase II. *Municipal Electric Utilities Association of the State of New York v. Power Authority of the State of New York, Order Terminating Phase II,* 30 FERC (CCH) ¶ 61,178 (Feb. 2, 1985). FERC reaffirmed its decision in *Municipal Electric Utilities Association of the State of New York v. Power Authority of the State of New York, Order on Rehearing Terminating Phase II,* 32 FERC (CCH) ¶ 61,269 (Aug. 21, 1985). In the later opinion, FERC found that PASNY's new wheeling agreements with the private utilities eliminated the restrictive provisions Ilion and MEUA challenged in Phase II and noted that Phase II was also mooted by changed circumstances. In *Opinion No. 229; Declaratory Opinion and Order Affirming with Modifications Initial Decision on Niagara Preference Power for States Neighboring New York,* 30 FERC (CCH) ¶ 61,323 (March 27, 1985), FERC had ordered PASNY to allocate 10% of Niagara hydro-power to preference customers in states neighboring New York. FERC concluded that, since MEUA's demands for preference power might well exceed 40% of the Niagara Project's *total* production by 1986–87, a decision to allocate preference power to Ilion to serve Remington Arms might require PASNY to take preference power out of the shares allocated to other preference customers in order to allocate additional power to Ilion. FERC concluded that such a decision raised questions "that

go beyond those associated with the anti-competitive question raised by MEU* [sic] and Ilion ... [and, accordingly that] any decision in Phase II on the issue as changed would not be in the public interest." *Municipal Utilities, supra,* 32 FERC (CCH) at p. ——, slip op. at 3.

Only the Village of Ilion appeals.

## DISCUSSION

The determinative issue on this appeal is whether the questions raised by Ilion in Phase II of the FERC proceeding have been mooted by our disposition of Phase I, *Power Authority, supra,* 743 F.2d 93, and PASNY's implementation of that decision. A case is moot and not subject to adjudication "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Murphy v. Hunt,* 455 U.S. 478, 481, 102 S.Ct. 1181, 1183, 71 L.Ed.2d 353 (1982) (per curiam); *County of Los Angeles v. Davis,* 440 U.S. 625, 631, 99 S.Ct. 1379, 59 L.Ed.2d 642 (1979); *Powell v. McCormack,* 395 U.S. 486, 496, 89 S.Ct. 1944, 1950, 23 L.Ed.2d 491 (1969). "[T]he basic inquiry is whether the 'conflicting contentions of the parties ... present a real, substantial controversy between parties having adverse legal interests, a dispute definite and concrete, not hypothetical or abstract.'" *Babbitt v. Farm Workers,* 442 U.S. 289, 298, 99 S.Ct. 2301, 2308, 60 L.Ed.2d 895 (1979) (quoting *Railway Mail Ass'n. v. Corsi,* 326 U.S. 88, 93, 65 S.Ct. 1483, 1487, 89 L.Ed. 2072 (1945)). It is settled that a dispute is neither real nor substantial when the resolution of that dispute "cannot affect the result as to the thing in issue in the case," *California v. San Pablo & Tulare Railroad,* 149 U.S. 308, 314, 13 S.Ct. 876, 878, 37 L.Ed. 747 (1893); *see also North Carolina v. Rice,* 404 U.S. 244, 246, 92 S.Ct. 402, 404, 30 L.Ed.2d 413 (1972), because intervening events or judicial decisions have granted the relief sought, or rendered it irrelevant. *See, e.g., Murphy, supra,* 455 U.S. at 481–82, 102 S.Ct. at 1183;

*County of Los Angeles, supra,* 440 U.S. at 631–32, 99 S.Ct. at 1383; *San Pablo & Tulare Railroad, supra,* 149 U.S. at 314, 13 S.Ct. at 878; *Direct Marketing Ass'n v. United States Postal Serv.,* 721 F.2d 55 (2d Cir.1983); *Alexander v. Yale University,* 631 F.2d 178, 183 (2d Cir.1980).

Except for failure to direct PASNY to furnish to Ilion the additional 7 MW of power demanded for resale to Remington Arms, the Phase I orders granted to MEUA and Ilion the relief sought by them in Phase II. They eliminated the restrictions on resale of preference power to industrial users, *see Power Authority, supra,* 743 F.2d at 104–07, *FERC Opinion 151–A, supra,* 23 FERC (CCH) at p. 61,081–82. They also precluded the wheeling agents from using restrictive contract provisions that would deny or hamper service to preference customers. *See Power Authority, supra,* 743 F.2d at 98; *FERC Opinion 151, supra,* at p. 61,149, *aff'd, FERC Opinion 151–A, supra,* at p. 61,080–81. The only alleged anticompetitive terms and conditions (other than those expressly barred by Phase I) are the provisions of unsigned 1979 contracts between PASNY and the private utilities. Those provisions allegedly allowed the utilities unilaterally to set voltage levels and delivery points for the Niagara Project power they wheeled to preference customers and to require the preference customers to bear the cost of transporting the power from the delivery point to the preference customers' electric substations. Neither Ilion nor MEUA allege that those contracts were ever signed or went into effect. They concede that PASNY's current wheeling contracts do not have similar provisions. The possibility that PASNY might amend the current wheeling contracts to include "restrictive" provisions such as those Ilion alleges were included in the apparently unfinalized 1979 agreements is too speculative and hypothetical to save Ilion's restrictive provision claims from mootness.[3] *Murphy, supra,* 455 U.S. at

---

3. Were Ilion later able to produce evidence of an anticompetitive conspiracy between PASNY and private utilities to harm it as a preference power customer, such as by restricting place-

482, 102 S.Ct. at 1183; *Babbitt, supra,* 442 U.S. at 298, 99 S.Ct. at 2308; *Ashcroft v. Mattis,* 431 U.S. 171, 172 n. 2, 97 S.Ct. 1739, 1740 n. 2, 52 L.Ed.2d 219 (per curiam), *rehearing denied,* 433 U.S. 915, 97 S.Ct. 2990, 53 L.Ed.2d 1102 (1977).

The claim of MEUA and Ilion that PASNY was providing MEUA's members with nuclear rather than hydroelectric power was simply a restatement of their claim that PASNY was refusing to sell to preference customers Niagara Project power they were entitled to buy. Our decision in Phase I resolved that claim by holding that PASNY had provided its preference customers with their proper share of Niagara Project, or similarly priced, power during the period 1961–85 and ordering PASNY to increase its allocation of such power to the preference customers during the period 1985–90. *Power Authority, supra,* 743 F.2d at 102–03, 110–13.

There remains the question of whether PASNY is obligated to furnish additional power claimed by Ilion for resale to Remington Arms. The answer turns on whether the additional power demanded by Ilion is part of its reasonably foreseeable needs according to the projection made in 1960–61 as modified by our earlier decision for the years 1985–90. We have approved this projection as the measure of relief to which preference customers are entitled under the NRA and have denied their demand for a larger share, i.e., the immediate sale to them of 50% of the entire Niagara Power output. *See Power Authority, supra,* 743 F.2d 103–04, 110–12.

Ilion does not claim in Phase II that PASNY has failed to provide it with the amount of power that PASNY is obligated to provide under the foregoing formula approved by us in Phase I. Instead, it seeks to go back to Square One, contending (for the first time in its reply brief) that the 1960–61 projection of reasonably foreseeable preference power needs was too low because it was tainted by PASNY's alleged unlawful conspiracy with privately owned utilities to preclude preference customers from reselling preference power to industrial users.

No facts are alleged or evidence proferred by Ilion to the effect that, when the forecast of preference customers' future needs was made in 1960–61, estimates based on resale of preference power to industrial users were rejected. Indeed, Ilion itself does not allege or show that when the 1960–61 forecasts were made it sought or was denied Niagara Project power for resale to Remington Arms.[4] On the contrary, as we noted in *Power Authority, supra,* 743 F.2d at 99–100, preference customers then had only a limited need for additional power and it was not until the 1970's that large numbers of industrial users were attracted to the area by the availability of relatively low-cost hydropower with the result that by 1980 preference customers were selling 58% of their preference power to industrial and commercial users. In contrast, back in 1960–61 the private utilities had reluctantly agreed to commit themselves to buy more than their immediate power needs only if they could be assured of a long-term stable source at a competitive price of non-withdrawable power that might later be used to meet a hoped-for increase in demand. *Id.* at 99. Moreover, at that same time MEUA, on behalf of its preference customers (including Ilion) openly endorsed the 1960–61 allocation of power made by PASNY, testifying in favor of it and offering a resolution

ment of substations, it may raise such claims, provided the relief it seeks has not already been limited by the NRA and granted by PASNY I.

4. Ilion made a specific request for power to serve Remington Arms in its initial 1978 complaint (containing Phase I and Phase II claims) filed with FERC. After FERC told it to file a more specific statement of its Phase II claims, spelling out, among other things, "the specific relief that is requested," 9 FERC (CCH) ¶ 61,128 at 61,251 (Nov. 2, 1979), Ilion omitted its request for a grant of power to serve Remington Arms. Instead, it asked that FERC order PASNY to provide its preference customers with power regardless of the type of customers to whom it was resold, to terminate the "restrictive provisions" in the wheeling contracts, and to provide Niagara Project power to the preference customers on reasonable terms and conditions.

of MEUA's preference customer members "unanimously commending" PASNY's action. *Id.* at 100.

Thus Ilion offers only to show conduct on the part of PASNY in the 1970's as the basis for its claim to additional preference power.[5] However, since its claim and that of other MEUA members for additional Niagara Project power over and above the 1960–61 foreseeable needs projection as modified was denied in Phase I, that claim has been adjudicated and is now moot. Ilion suggests, however, that, though its claim for prospective relief in the form of power to serve Remington Arms may be moot, its Phase II complaint survives because FERC could require PASNY to sell it extra power as a form of retrospective relief for PASNY's alleged anticompetitive past refusal to sell it an additional share of Niagara Project power, Ilion, however, never offered this interpretation of Phase II to the ALJ or FERC. Accordingly, we cannot consider it here. 16 U.S.C. § 825*l*(b); *F.P.C. v. Colorado Interstate Gas Co.*, 348 U.S. 492, 498–501, 75 S.Ct. 467, 471–72, 99 L.Ed. 583 (1955); *Cincinnati Gas & Elec. Co. v. F.E.R.C.*, 724 F.2d 550, 553 (6th Cir.1984); *Greene County Planning Board v. F.P.C.*, 528 F.2d 38, 45 (2d Cir. 1975); *Rhode Island Consumers Council v. F.P.C.*, 504 F.2d 203, 212 (D.C.Cir.1974). Moreover, the argument rests on the erroneous assumption that, even though PASNY furnished Ilion with its preference power needs as reasonably foreseen in 1960–61 and was not obligated to supply it with more preference power, PASNY (and presumably other users of Niagara Project power) can now be penalized because PASNY took the view that preference power should not be resold to industrial users. This contention must be rejected. The controlling issue is whether Ilion received all the preference power, as against private utilities, to which it was entitled under the NRA. That question was litigated in Phase I and disposed of by our holding that PASNY had satisfied "substantially all" of the preference customers' reasonably foreseeable needs. *Power Authority, supra,* 743 F.2d at 110–13.[6] Ilion is barred by doctrines of collateral estoppel and mootness from now relitigating that issue in Phase II.[7]

Our decision thus precludes Ilion from seeking to increase the size of the pool of Niagara Project power available to preference customers so that it may obtain additional power for resale to Remington Arms. However, nothing in our decision bars Ilion from filing a complaint with FERC under § 306 of the Federal Power Act, 16 U.S.C. § 825e, *see also* 18 C.F.R. § 385.206, *et seq.* challenging PASNY's action and seeking a reallocation of the pool of preference power which would increase the allotment of such power to it. Such an application, of course, would involve other considerations, including the respective claims of preference customers to shares of preference power, and we imply no views as to its potential merit. We mention it only to make clear that our

---

5. Ilion does refer to PASNY's denial in May 1962 of the request of the Village of Silver Springs, New York, for an additional 2,000 KW of preference power for resale to the Morton Salt Company. However, as a memorandum of PASNY's General Counsel to its Chairman later noted, when Silver Springs was requested back in 1958 and 1959 for information as to its reasonably foreseeable requirements no reply was received until late 1961 at which time it estimated its future requirements as 350 KW in 1963 to 390 KW in 1967. It was then offered a contract for 450 KW which it refused on the ground that the amount was too high, whereupon it accepted a contract for 400 KW which it viewed as entirely satisfactory for a good many years to come.

6. FERC found that it was reasonably foreseeable in 1960–61 that the preference customers would need 548.36 MW annually through June 30, 1985. It concluded that PASNY had been supplying them with 547.2 MW of Niagara or like-priced hydroelectric power. The de minimis shortfall of 1.16 MW would not justify furnishing to Ilion the retrospective relief it now alleges it sought in Phase II.

7. In light of the foregoing, we find it unnecessary to consider the argument, which FERC accepted in *Order on Rehearing Terminating Phase II, supra,* but did not advocate on this appeal, that Phase II is mooted by changed circumstances.

decision does not preclude Ilion's seeking such relief.

We affirm FERC's dismissal of Ilion's complaint and request for a declaratory order in Phase II as moot, without prejudice to Ilion's right to seek an increase in its share of the pool of power available to preference customers under the NRA and our Phase I decision.

