**STEELTECH, LIMITED, Plaintiff,**

v.

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, Defendant.**

No. 1:99–CV–736.

United States District Court, W.D. Michigan, Southern Division.

June 27, 2000.

---

**3.** The stipulated facts specifically indicate that CCC sold memberships "subject to approval."

Stipulated Facts. ¶ 5.

Scott J. Steiner, Rhoades, McKee, Boer, Goodrich & Titta, Grand Rapids, MI, for Steeltech Limited, plaintiffs.

W. Francesca Ferguson, U.S. Attorney's Office, Western District of Michigan, Grand Rapids, MI, Andrew J. Doyle, U.S. Department of Justice, Environment & Natural Resources Division, Environmental Defense Section, Washington, DC, Eva Hahn, U.S. Environmental Protection Agency, Region V, Chicago, IL, for Environmental Protection Agency, defendants.

## OPINION

ENSLEN, Chief Judge.

This matter is before the Court on Appellant Steeltech, Limited's ("Steeltech's") appeal of Appellee United States Environmental Protection Agency's ("EPA's") Final Decision of August 26, 1999, which assessed a civil penalty in the amount of $61,736 under the Emergency Planning and Community Right–to–Know Act ("EPCRA"), 42 U.S.C. §§ 11001–11050. For the reasons which follow, the decision is affirmed.

### ADMINISTRATIVE RECORD

Since this is an administrative appeal, the facts necessary for resolving this matter are contained in the administrative record. According to that record, Steeltech is a Michigan corporation with its principal place of business at 1252 Phillips Avenue, SW, Grand Rapids, Michigan 49507. (Administrative Record ("AR"), Exhibit 31 ("Joint Stipulated Facts" or "JSF") at ¶ 2.) From 1989 through 1993, Steeltech operated a manufacturing business at its principal place of business. (JSF at ¶ 4.) During these years, Steeltech employed more than 50 full-time employees and compensated them for more than 20,000 hours per calender year. (JSF at ¶¶ 5, 14, 21, 30, 38, 47.) During these years, Steeltech manufactured and processed iron, nickel, chrome and cobalt alloy castings and was classified under Industrial Classification Code 3369. (JSF at ¶¶ 6–7.) Nickel, chromium and cobalt are toxic chemicals under Section 313 of EPCRA. 42 U.S.C. § 11023(c). Reporting is required as to such toxic chemicals if the amount manufactured exceeds the threshold report amount specified by statute. 42 U.S.C. § 11023(f)(1). For the calender years after July 1, 1989, the threshold amount is 25,000 pounds per year. *Id.* Reporting is required on a yearly basis on or before July 1 of each year. 42 U.S.C. § 11023(a).

During 1989, Steeltech earned an estimated 7 million dollars in gross annual sales, (JSF at ¶ 19), and had a net loss of $71,011. (*Id.* at ¶ 20.) During the 1989 calender year, Steeltech processed 351,625 pounds of nickel and 256,238 pounds of chromium. (*Id.* at ¶¶ 22, 26.) Steeltech did not report its processing of nickel and chromium for 1989 until February 13, 1992 when it submitted a Form R. (*Id.* at ¶¶ 23, 27.)

During 1990, Steeltech earned an estimated 5.9 million dollars in gross annual sales, (JSF at ¶ 28), and had a net loss of $79,936. (*Id.* at ¶ 29.) During the 1990

calender year, Steeltech processed 285,890 pounds of nickel and 208,335 pounds of chromium. (*Id.* at ¶¶ 31, 33.) Steeltech did not report its processing for 1990 until it submitted its Form R on February 13, 1992. (*Id.* at ¶¶ 32, 34.)

During 1992, Steeltech earned an estimated 8 million dollars in gross annual sales, (JSF at ¶ 36), and had a net income of $132,356. During the 1992 calender year, Steeltech processed 283,901 pounds of nickel and 189,268 of chromium. (*Id.* at ¶¶ 39, 42.) Steeltech did not report its 1992 processing on Form R until November 15, 1994. (*Id.* at ¶ 41, 44.)

During 1993, Steeltech earned an estimated 8 million dollars in gross annual sales, (JSF at ¶ 45), and had a net income of $138,099. (*Id.* at ¶ 46.) During the 1993 calender year, Steeltech processed 347,933 pounds of nickel, 231,955 pounds of chromium, and 162,369 pounds of cobalt. (*Id.* at ¶ 48, 51, and 54.) Steeltech did not report its 1993 processing on Form R until November 15, 1994. (*Id.* at ¶¶ 50, 53 and 56.)

On September 2, 1994, the EPA filed an Administrative Complaint against Steeltech asserting that Steeltech had violated Section 313 of EPCRA, 42 U.S.C. § 11023, by failing to timely report the processing of toxic chemicals for calender years of 1988–1990. The EPA requested civil penalties for the reporting violations pursuant to Title 42 United States Code Section 11045(a). On March 14, 1995, the EPA amended its Administrative Complaint to seek additional penalties for violations during the calender years of 1992 and 1993.

On September 23, 1997, an administrative hearing was held before the Honorable Susan L. Biro, Chief Administrative Law Judge, in Grand Rapids, Michigan. Upon hearing, the EPA withdrew its allegations as to the 1988 calendar year (contained in Counts I and II). At such hearing, the EPA relied upon the parties' stipulated facts and stipulated exhibits. Steeltech presented the testimony of three witnesses: Michael Farmer; Gary Salerno; and James Pews. (AR, Exhibit 43 at 3.)

Michael Farmer testified that he was the president of Steeltech from 1986 to 1990. (AR, Exhibit 43 at 26.) He testified that he attempted to comply with regulatory requirements by hiring an experienced accountant and foundry manager. (*Id.*) He testified that non-compliance from 1989 to 1990 was due only to his company's lack of knowledge of the regulatory requirements. (*Id.*)

Gary Salerno testified that he became the controlling majority shareholder and president of Steeltech in 1990 when he purchased his controlling shares. (AR, Exhibit 43 at 42–43.) He indicated that Michael Farmer had not communicated to him any information about the reporting requirements when he assumed control of the company and that he was unaware of the filing requirements until 1994. (*Id.* at 46.) He indicated that Armand Salerno (his father and a manager in the company) had learned about the non-filing in 1992, and took steps to file the Form R. (*Id.* at 47.) Shortly thereafter, Ron Wells, the vice-president for operations, assumed the regulatory filing duties. (*Id.* at 47–49.) Wells left the position not long afterwards and was replaced by John Decker in early 1993. (*Id.*) It was not communicated to Decker that he was responsible for filing the reporting forms and this was subsequently neglected. (*Id.*) When Steeltech received the EPA Complaint in 1994, Gary Salerno then assigned the regulatory filing duties to James Pews, vice-president of finance. (*Id.* at 50.)

James Pews testified that he is the chief financial officer for Steeltech. (AR, Exhibit 43 at 72.) He testified that he was assigned the regulatory filing duties by Salerno on or about September 1994. (*Id.* at 73–74.) He also explained that Steeltech lacked notice after Ron Wells left the company because the company was left off the EPA's mailing list for forms. (*Id.* at 75–76.) He learned on October 24, 1994 that the 1992 and 1993 forms had not been

timely filed when he received a telephone call from Bob Allen of the EPA. He admitted the non-filing during the telephone call. (*Id.* at 77 .) Pews filed the forms on November 15, 1994. (*Id.* at 77.)

Based on all the evidence of record, Judge Biro issued the Initial Decision on May 27, 1998, which determined a total penalty of $61,736. (AR, Exhibit 55.) The Decision, which speaks for itself, included lengthy and detailed discussions of the EPA's enforcement policy for civil penalties, known as the Environmental Response Policy or "ERP." The ERP provides a system for assessing civil penalties based on the "gravity" of the violations and then allows adjustments to those penalties based on a number of factors.

Steeltech moved for rehearing on June 25, 1998. The motion was denied by Order of August 14, 1998. (AR, Exhibit 62.)

Steeltech then appealed the decision to the Environmental Protection Agency's Environmental Appeals Board ("EAB") on September 4, 1998. After briefing, the EAB issued its Final Decision affirming the penalty on August 26, 1999. (AR, Exhibit 63.)

Steeltech then appealed the Final Decision by filing its Notice of Appeal with this Court on September 23, 1999. Briefing of the appeal is now complete. Oral argument is unnecessary to resolve the appeal and would unnecessarily protract the resolution of this appeal. *See* Local Civil Rule 7.2(d).

## STANDARD OF REVIEW

This administrative appeal was filed pursuant to Title 42 United States Code Section 11045(f), which authorizes a person assessed a civil penalty under EPCRA to appeal the decision to the requisite United States District Court. The parties agree that the standard for review of the administrative decision is provided by the Administrative Procedures Act ("APA"), 5 U.S.C. § 706, which provides:

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity; . .

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

5 U.S.C. § 706. *See also Hopi Tribe v. Navajo Tribe,* 46 F.3d 908, 914 (9th Cir. 1995) (stating that "[u]nless Congress specifies otherwise, we review agency action under the Administrative Procedures Act.")

 Under the APA, an administrative determination should be set aside only if "it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." *Sierra Club v. Slater,* 120 F.3d 623, 632 (6th Cir.1997). *See also Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 375, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989); *Communities, Inc. v. Busey,* 956 F.2d 619, 623 (6th Cir. 1992). While this review accords deference to factual determinations supported

by substantial evidence, it does not excuse either errors of law or arbitrary decision-making. *Compare McQueen v. Williams,* 177 F.3d 523 (6th Cir.1999); *Tolbert v. Ohio Department of Transportation,* 172 F.3d 934 (6th Cir.1999); *Community First Bank v. National Credit Union Admin.,* 41 F.3d 1050 (6th Cir.1994). To the extent the appeal raises questions of statutory interpretation, the Court is required to accept the Agency's statutory interpretation provided that it is reasonable. *Chevron U.S.A., Inc. v. N.R.D.C.,* 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

## *LEGAL ANALYSIS*

Appellant urges three bases for appeal. Appellant urges that the Administrative Law Judge and Appeals Board committed legal error in applying the ERP as a rule of law, in denying adjustments to which Steeltech was entitled, and in denying Steeltech's motion to reopen the hearing. Each argument will be addressed in turn.

### *1. Application of the ERP*

EPA's Environmental Response Policy provides a mechanism for grading the seriousness of violations on a matrix table— with the most serious violations (circumstance level one, extent level A) receiving the maximum statutory penalty of $25,000, and the least serious (circumstance level 6, extent level C) receiving a penalty of $200. (AR, Exhibit 43, Joint Stipulated Exhibit 2, at 11.) Failures to timely report the processing of toxic chemicals within one year are classified as circumstance level-one violations. (*Id.* at 4, 12.) Failures to timely report less than one year are classified as circumstance level-four violations and the amount of the penalty depends in part on the date of filing. (*Id.* at 4, 12 .) The extent level depends on the amount of chemical processed (*i.e.,* was it more than 10 times the threshold amount), the extent of the company's sales (*i.e.,* was it more than $10 million), and the number of the company's employees (*i.e.,* was it 50 or more). The combined effect of these factors is explained in a chart on page 9 of the ERP. (*Id.* at 9.) There is no dispute

here as to the calculation of the penalty amounts under the matrix.

Another aspect of the ERP is that it allows reductions from the matrix penalties under certain specified circumstances. The ERP provides that lack of knowledge is not a basis for adjustment since the EPA does not intend to encourage ignorance of its requirements. (*Id.* at 14.) The ERP provides that adjustments may be made for a variety of reasons including "voluntary disclosure," "attitude," "other factors as justice may require," and "inability to pay." (*Id.* at 14–19.) The voluntary disclosure adjustment applies when the entity discloses the violation on a Form R, or other reporting form, without a prior investigation of the EPA. (*Id.* at 14–16.) If the adjustment applies, then a reduction of up to 50 percent may be applied. (*Id.*) The extent of the reduction above 25 percent depends on whether disclosure is made promptly after the non-reporting is discovered, whether the person has taken steps to prevent violations in the future, and the history of violations within the last two reporting periods. (*Id.* at 15; *see also* AR, Exhibit 63, at 8.) If the reduction applies, then the policy advises against applying a further adjustment for "attitude" since it deems the reductions "mutually exclusive." (*Id.* at 16.) The attitude adjustment has "two components—(1) cooperation and (2) compliance. An adjustment of *up to* 15 percent can be made for each component." (*Id.* at 18.) The catchall "justice adjustment" is advised in cases where the penalty scored is "disproportionately high." It includes cases of "borderline" violations and "lack of control over the violation" where the penalty otherwise assessed would be excessive (*Id.* at 18.) The ERP also permits an unlimited departure where the penalty exceeds the violator's ability to pay. (*Id.* at 19) The ERP places the burden of showing inability to pay upon the violator. (*Id.* at 19–20.)

In this case, these adjustments were applied to substantially reduce the penalties assessed—from $87,367 to $61,736.

The Administrative Law Judge did this by giving Steeltech a 20 percent attitude adjustment for Counts III–VI (the 1989 and 1990 Counts) and a 42 percent voluntary disclosure adjustment for Counts VII–XI (the 1992 and 1993 Counts). The Appeals Board disagreed with some of the Administrative Law Judge's reasoning but approved the amount of the fine as warranted under the facts and circumstances of the case.

▮ Appellant's first argument is that the EPA improperly treated the ERP as a rule of law. It is true that the ERP does not have the force or effect of law. It is a policy statement which must be considered in assessing a penalty. If the EPA's decision was premised on the view that the ERP was binding, then a remand would be required. *See Panhandle Eastern Pipe Line Co. v. FERC*, 198 F.3d 266, 269 (D.C.Cir.1999) (quoting *Pacific Gas & Elec. Co. v. Federal Power Commission*, 506 F.2d 33, 38 (D.C.Cir.1974)); *In re Catalina Yachts, Inc.*, 1999 WL 198912 (E.A.B. March 24, 1999) (unpublished opinion); *see also* 40 C.F.R. § 22.27(b) (stating that EPA is only required to "consider" the ERP). However, both the decision of the Administrative Law Judge and the decision of the Appeals Board expressly recognized that the ERP merely provides guidance and that departure from the ERP is appropriate in certain circumstances. (*See* Final Decision, AR, Exhibit. 63, at 11–12 (stating that ERP "does not have the force of law ... [and] 'the EPA's adjudicative officers must refrain from treating the [ERP] as a rule,' and must be prepared to 'reexamine the basic propositions' on which the policy is based in any case in which those 'basic propositions' are genuinely placed at issue.' ")); (Initial Decision, AR, Exhibit 55 at 10 (stating that "a penalty policy, such as ...[the] ERP, is not unquestionably applied as if the policy were a rule with 'binding effect.' ")) [1] The Appeals Board also recognized that the Administrative Law Judge's reference to

an "extraordinary circumstances" standard in assessing whether to depart from the ERP was improper, but determined that this reference had not affected the setting of the penalty—which was otherwise proper. (AR, Exhibit 63, at 11–13.) The Court believes that the use of any language in the Initial Decision or Final Decision suggesting that the ERP was binding, at most, constituted harmless error.

▮ Appellant also argues that the decision to apply the ERP was not supported by evidence of record and was arbitrary or capricious. Appellant argues that the EPA acted arbitrarily in failing to depart from the ERP scoring based on a catalogue of reasons: Appellant's violations were unintentional; it was under severe financial pressures (*i.e.*, the threat of bankruptcy); it experienced employee turnover; the EPA contributed to the non-filing by not mailing forms or notices to Steeltech; the EPA delayed too long in filing its Administrative Complaints; the non-filing did not cause any environmental harm; and the EPA ignored its own "self-policing policy."

▮ Contrary to the asserted arguments, both the Administrative Law Judge and Appeals Board considered these arguments and rejected them for legitimate reasons as stated in their decisions. The EPA's decision not to limit the penalties for unintended violations was reasonable because such a policy might have had the effect of encouraging a lack of diligence on the part of regulated facilities (as recognized in the ERP). The EPA's decision not to further excuse the penalties caused by business and financial pressures was reasonable given that reporting is a minimal, relatively inexpensive and important regulatory requirement. *See In re Chempace Corp.*, 2000 WL 696821 (E.A.B. May 18, 2000)(unpublished opinion); *In re Wheeling–Pittsburgh Steel Corp.*, 2 E.A.D. 79 (E.A.B.1985). Furthermore, due to the

1. It is noteworthy that the application of the ERP resulted in a civil penalty much smaller than that permitted under the statute, which

authorizes a $25,000 penalty for each of the nine violations. *See* 42 U.S.C. § 11045(c).

importance of the regulatory requirements and because of the evidence of Steeltech's earnings in 1992 and 1993, it was reasonable to not further reduce the fine based on inability to pay. *Id.* The EPA's decision not to further excuse the penalties due to its failure to send reporting forms was likewise reasonable in that the EPA had taken other steps (*i.e.*, its inspection of Steeltech in 1992 and its June 1992 Notice of Noncompliance, Joint Stipulated Exhibit 4), which should have had the effect of notifying Steeltech of its responsibilities. The EPA's decision not to excuse the penalties for the two and one-half year delay in filing an administrative complaint was also reasonable in that the law does not require action by the EPA earlier than the expiration of the limitations period and there is no evidence to suggest that the EPA was deliberately dilatory for the purpose of securing greater penalties.[2] The EPA's decision not to depart on the ground that no environmental harm was associated with the failure to report was reasonable in that EPCRA contemplates that the lack of information about the use of toxic chemicals is harm enough to warrant the civil penalties. *See In re Clarksburg Casket Co.*, 1999 WL 504709 (E.A.B. July 16, 1999)(unpublished opinion); *In re Woodcrest Mfg. Inc.*, 1998 WL 432785 (E.A.B. July 23, 1998) (unpublished opinion); *see also Atlantic States Legal Foundation, Inc. v. United Musical Instruments, U.S.A., Inc.*, 61 F.3d 473, 474 (6th Cir.1995). The EPA's decision not to depart under its "self-policing policy" is also rational in that the policy by its terms is non-binding, is limited to settlement negotiations, and is not intended for use in pleadings, hearings, or trials. *See* U.S.E.P.A.—Incentives for Self–Policing: Discovery, Disclosure, Correction and Prevention of Violations, 60 Fed.Reg. 66,702, 66,712 (Dec. 22, 1995). Although the EPA might well have resolved some of these arguments differently, the decisions made were rational and cannot be set aside under the APA standards.

### 2. Mistakes in Applying the ERP

 Steeltech also urges that the EPA misapplied the ERP. Specifically, it urges that it was entitled to a full 30 percent attitude reduction for all counts and that it was entitled to a 25 percent justice reduction for Counts III–VI.

Appellant's request for an application of both attitude and voluntary disclosure reductions to the various counts is contrary to the EPA's policy of treating these reductions as "mutually exclusive." It is also contrary to the usual practice of courts in assessing any kind of scoring—which dictates that the courts not compensate twice for substantially identical factors. The Court does not believe that the circumstances of this case warrant a double reduction. Furthermore, the Court does not believe that it was errant for the EPA to give Steeltech only partial attitude reductions given the levels of cooperation and compliance described in the record. The EPA has discretion in setting those penalties so as to gauge the level of cooperation and compliance and the Court cannot say that EPA's assessment was arbitrary or capricious on the present record.

 Finally, the facts surrounding Steeltech's financial troubles, lack of control and change in ownership were not so extreme as to require the EPA to award a further 25 percent justice reduction. That reduction is intended to reduce penalties which appear manifestly unjust under the circumstances, which cannot be said of the present penalties. *See Catalina Yachts, Inc. v. EPA*, No. 99–07357 (C.D.Cal. Feb. 23, 2000) (unpublished decision) (applying "manifestly unjust" standard for "justice" reductions). The EPA acted within its discretion in determining the penalties.

---

**2.** As explained by the EPA, the delay in filing was a product of its under staffing. (*See* Appellee's Brief at 24.)

### 3. Motion to Reopen Hearing

Finally, Steeltech challenges as arbitrary the decision of the Administrative Law Judge denying a request to reopen the hearing to solicit more testimony from James Pews. Steeltech, after hearing, asked to reopen the hearing to present more testimony from Pews about the "voluntary disclosure" of the non-reporting in 1992 and 1993 because Steeltech believed that the Administrative Law Judge has misinterpreted the Stipulations. The request was denied because Steeltech was given a full and fair opportunity to present Pews' testimony at hearing and because the Administrative Law Judge felt that the additional testimony would not affect her assessment of fine in light of the history of violations associated with the 1992 and 1993 violations. (AR, Exhibit 62.) The Appeals Board affirmed the decision based on the fact that the additional evidence requested would not have resulted in a further reduction of the penalty. (AR, Exhibit 63 at 19–26 and notes 19–21.) The Court believes that Steeltech was afforded an adequate opportunity to present evidence, that the failure to reopen the hearing for additional testimony was not arbitrary and capricious, and that it did not prejudice Steeltech.

### CONCLUSION

In accordance with this Opinion, Judgment shall issue affirming the decision of the Environmental Appeals Board.