UNITED STATES of America,
et al., Plaintiffs,

v.

CITY OF DETROIT, et al., Defendants.

No. CIV.77–71100.

United States District Court,
E.D. Michigan,
Southern Division.

Oct. 22, 2003.

Jon M. Lipshultz, U.S. Dept. of Justice, Environment & Natural Resources, Washington, D.C., for Plaintiff.

Joseph Basta, For City of Detroit and DWSD, Dykema Gossett, Detroit, John Leone, For State of Michigan, Michigan Dept of Attorney General, Natural Resources Division, Lansing, for Defendants.

## OPINION AND ORDER

FEIKENS, District Judge.

### INTRODUCTION

On November 22, 2000, I ordered the Army Corps of Engineers (Corps) to accept dredged materials from Conner Creek at its Confined Disposal Facility (CDF) at Pointe Mouillee. The Corps appealed. On remand, the *en banc* court for the United States Court of Appeals for the Sixth Circuit has ordered me to rule on the following issues: (1) whether Detroit could have sued the Corps under the Administrative Procedures Act (APA), and if so, whether "exceptional circumstances" nonetheless exist to justify use of the All Writs Act; and (2) whether the Corps' decision to conduct an Environmental Assessment (EA) was "arbitrary" or "capricious." *U.S. v. City of Detroit*, 329 F.3d 515 at 527 (6th Cir.2003) (*en banc* ).

### FACTUAL BACKGROUND

The general facts surrounding this case have been sufficiently developed in three previous (unpublished opinion), 329 F.3d 515 (6th Cir.2003) (*en banc* ). In the interest of judicial economy, I will not recite those facts here.

What is not covered in those opinions, however, is the Corps' history of accepting environmental dredging materials at the Pointe Mouillee CDF, which is relevant to this remand.

On May 10, 1974, the United States and the State of Michigan entered into an agreement to construct a Confined Disposal Facility at Pointe Mouillee, Lake Erie. The agreement states that the Pointe Mouillee CDF is "for the containment and retention of dredged materials from the channels of the Detroit and Rouge Rivers." An Environmental Impact Statement (EIS) was also developed in 1974. It states that the Pointe Mouillee CDF's main environmental impact is the "[c]ontainment of the polluted dredge spoil [which will] remove it as a source of pollution from the open waters of the bay." [1] U.S. Army Corps of Engineers, *Final Environmental Statement; Confined Disposal Facility at Pointe Mouillee for Detroit and Rouge Rivers*, Summary at ¶ 3(a) (March 1974).

### ANALYSIS

A. *Mootness*

 The Corps argues that this portion of the case is now moot, because the funding issues that existed in late 2000 do not currently exist, and because defendants might not need to use Pointe Mouillee CDF for disposal. (U.S. Army Corps of Engineers' Br. Regarding Issues Remanded by the U.S. Court of Appeals for the 6th Circuit at 2.) To avoid dismissal for mootness, "an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed." *Preiser v. Newkirk*, 422 U.S. 395, 401, 95 S.Ct. 2330, 45 L.Ed.2d 272 (1975) (quoting *Steffel v. Thompson*, 415 U.S. 452, 459, n. 10, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974)) (internal quotation marks omitted). In addition, the Court must be able to provide some remedy or a case is moot. *Church of Scientology of Cal v. United States*, 506 U.S. 9, 12, 113 S.Ct. 447, 121 L.Ed.2d 313

---

1. This refers to the bay at Pointe Mouillee, whose waters are fed by the Detroit River system, of which the Rouge River and Conner Creek are a part. *See* U.S. Army Corps of Engineers, *Final Environmental Statement;*

*Confined Disposal Facility at Pointe Mouillee for Detroit and Rouge Rivers*, at 45 (March 1974). '57FWater quality in the vicinity of Pointe Mouillee is "influenced considerably by [ . . .] the Detroit River[ ]." *Id.* at 24.

(1992). The party asserting mootness bears the "heavy burden of demonstrating mootness." *Cleveland Branch, N.A.A.C.P. v. City of Parma, OH*, 263 F.3d 513 at 531 (6th Cir.2001) (citing *County of Los Angeles v. Davis*, 440 U.S. 625, 631, 99 S.Ct. 1379, 59 L.Ed.2d 642 (1979)).

Neither of the Corps' arguments renders the case moot. The first argument simply raises a legal issue in the case (my ability to use the All Writs Act to issue an order). Even if the All Writs Act did not apply, this would not eliminate the controversy between the state and local governments and the Corps about the acceptance of dredged sediments at Pointe Mouillee CDF, nor would it prevent the grant of all possible remedies. It is evident on the face of the questions that the Sixth Circuit remanded to me that even if the All Writs Act may not provide a remedy this Court could grant, the APA may very well do so. 329 F.3d 515 (6th Cir.2003). As discussed below, this Court is empowered to give a remedy under either statute.

Moreover, the reason my 2000 order was sufficient to secure funding was because it served as a guarantee that there was a facility that would accept the dredged materials, and therefore the project could go forward if funding was provided. The Corps argues that if that guarantee evaporated today, because the loan has gone through, there would be no practical barriers to continuing the project mandated by the Consent Judgment of this Court. There were two practical barriers to the mandated project that my order cleared away, however. To go forward on time, the project had two requirements: the disposal site and funding. If funding continued despite the removal of the Court's guarantee, that funding is used, in part, to produce dredged material that requires disposal. The fact that funding depended on securing a disposal site underscores, not obviates, that timely availability of a

disposal site is crucial to the project's success. Therefore, the potential existence of current funding issues or lack thereof does not render this case moot.

The second potential factual change cited by the Corps, whether there is a continuing need by defendants to use Pointe Mouillee CDF for disposal, does go to the heart of the controversy that makes up this case. The Corps argues that the dredging project *"may* well be completed without the need for any disposal at the Pointe Mouillee CDF," and for that cites a statement by Michigan's counsel that also used the word "may." (Army Corps of Engineers' Br Regarding Issues Remanded by the U.S. Court of Appeals for the 6th Circuit, at 2 and 44, fn 14 [emphasis mine].) Other than this equivocation, the Corps cites nothing to support its assertion that the project completion would go forward without delay even if it prevented defendants from using the Pointe Mouillee CDF in a timely fashion. This single statement simply cannot bear the weight of the "heavy burden" of the party asserting mootness. 440 U.S. 625, 99 S.Ct. 1379, 59 L.Ed.2d 642.

Since I find this case is not moot for the reasons stated above, I now proceed to answer the questions the Sixth Circuit has remanded to me.

B. *Applicability of the APA and use of the All Writs Act*

1.

Under the APA, 5 U.S.C. § 101 *et seq.*, courts can review only those agency actions made reviewable by statute or actions that are "final." 5 U.S.C. § 704. In order to determine when an agency action is "final," the Supreme Court has put forward a two-part test:

"First, the action must mark the consummation of the agency's decisionmaking process-it must not be of a merely

tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154 at 177–78, 117 S.Ct. 1154, 137 L.Ed.2d 281.

The decision not to prepare an EIS is reviewable as a final action, just as a final EIS or a Finding of No Significant Impact (FONSI) is. *See Sierra Club v. Slater*, 120 F.3d 623 (6th Cir.1997) (holding that a final EIS constitutes final agency action, and reviewing the decision not to do a Supplemental EIS (SEIS) as a final action under the APA); *Southwest Williamson County Comm. Ass'n v. Slater*, 173 F.3d 1033 (6th Cir.1999) (holding that a FONSI constitutes final agency action subject to review under the APA).

Here, however, the Corps' argues it has not made a final decision to seek an EIS, and has simply decided to conduct an Environmental Assessment (EA) to determine whether or not to do a supplemental EIS. The Corps then argues that the decision to conduct an EA is "preliminary" and therefore not subject to the same standard of judicial review. However, the Corps argument is a distinction without a difference, since the decision to conduct an EA, like the decision to conduct an EIS, satisfies both prongs of the Supreme Court's *Bennett v. Spear* test for finality and is therefore reviewable under the APA.

First, the Corps' decision to conduct an EA was neither "interlocutory" or "tentative." The Corps decision to do an EA is definitive on that issue, and the Corps' brief makes it clear the Corps' determination that an EA is necessary is firm, not tentative. In its argument that its decision to do an EIS is not yet made, the Corps makes its firm position on whether or not an EA is necessary clear: "[The Corps] has determined that that question—*whether or not* the 1974 EIS should

be supplemented with an SEIS should be deliberately examined and formally answered in an EA." (U.S. Army Corps of Engineers' Br. Regarding Issues Remanded by the U.S. Court of Appeals for the 6th Circuit at 58.) The use of the past tense in referring to the decision to conduct an EA makes it clear this decision is neither tentative or temporary, and therefore, satisfies the first prong of the Supreme Court's test in *Bennett v. Spear*, 520 U.S. 154, 117 S.Ct. 1154, 137 L.Ed.2d 281.

Second, an EA can be a necessary and required component of compliance with the National Environmental Policy Act (NEPA) on its own, just as an EIS can be. 40 CFR § 1501.4; 40 CFR § 1502. Therefore, legal consequences flow from the decision whether to conduct an EA. The Corps' decision therefore satisfies the second prong of *Bennett v. Spear* as well. 520 U.S. 154, 117 S.Ct. 1154, 137 L.Ed.2d 281.

Because the Corps' decision to conduct an EA is "final" as required by the Administrative Procedure Act, I therefore find that defendants could have brought suit under that Act.

2.

Though defendants could have brought suit under the APA, "exceptional circumstances" nonetheless exist to justify the use of the All Writs Act instead of the APA to give relief in this case.

The All Writs Act "authorizes a federal court in exceptional circumstances to issue such orders to persons 'who, though not parties to the original action or engaged in wrongdoing, are in a position to frustrate the implementation of a court order or the proper administration of justice, and encompasses even those who have not taken any affirmative action to hinder justice.'" *United States v. N.Y. Tel. Co.*, 434 U.S. 159, 174, 98 S.Ct. 364, 54 L.Ed.2d 376

(1977), *cert. denied,* 480 U.S. 910, 107 S.Ct. 1358, 94 L.Ed.2d 528 (1987). In *Pennsylvania Bureau of Corr. v. United States Marshals Serv.,* 474 U.S. 34, 106 S.Ct. 355, 88 L.Ed.2d 189 (1985), the Supreme Court stated that "where a statute specifically addresses the particular issue at hand, it is that authority, and not the All Writs Act, that is controlling." *Id.* at 43, 106 S.Ct. 355. However, the Court also carved out an exception, holding that "[t]here may be exceptional circumstances in which a district court can show clearly the inadequacy of the statute that specifically addresses the particular issue at hand." *Id.* The Sixth Circuit has remanded this case for a determination of whether such "exceptional circumstances" exist in this case. 329 F.3d 515.

In this case, exceptional circumstances exist that demonstrate the inadequacy of the APA to ensure implementation of a Consent Judgment under this Court's jurisdiction. Defendants were faced with a serious deadline in order to qualify for the State's revolving fund loan, funding necessary for completing a project mandated by a Consent Judgment. If defendants did not obtain the loan, the City could be subject to $40 million in interest payments alone. The Corps was dragging its feet at the negotiating table and came up with last minute obstacles to frustrate the Consent Judgment. Here, the Corps' decision to undertake the formal process of conducting an EA created a delay in securing a disposal site that jeopardized the funding. The ability of defendants to comply with the Consent Judgment was therefore threatened and a defeating factor reared its head.

The APA was inadequate to address the situation at hand. Though the Corps' decision about the need for further environmental review, and the resulting delay, could have been a defeating factor without my order, an order under the APA vacating the decision would not address the problem. Under the APA, courts have the authority to set aside an agency decision, but not to impose a different decision. *See, e.g., Sierra Club v. Slater,* 120 F.3d 623, 632 (6th Cir.1997) (citing 5 U.S.C. § 706). Thus, in this case, an order under the APA not only fails to solve the problem of delay that jeopardized funding and compliance with the Consent Judgment, it potentially exacerbates the situation by creating more delay by ordering the Corps to reevaluate its decision to conduct an EA.

Therefore, I find that this case does present the kind of "exceptional circumstances" that render the APA inadequate, and therefore that the use of the All Writs Act as a basis for my order was appropriate.

**B.** *Whether the Corps' decision to obtain an EIS was arbitrary and capricious*

■ Given that the All Writs Act is an appropriate basis for my order since extraordinary circumstances did exist, it is not strictly necessary to decide the second issue remanded to me by the *en banc* court, "whether the Corps' determination that another Environmental Assessment (EA) was necessary was 'arbitrary' or 'capricious,'" citing to *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989). However, because I find the Corps' action "final" and therefore reviewable, and because the potential for a remedy under the APA informs my analysis of mootness and of the All Writs Act usage, I will endeavor to answer the question.

My analysis of this issue begins with a study of the important teachings in *Marsh.* The Supreme Court said that "NEPA does not work by mandating that agencies achieve particular substantive environmental results." ... "Rather, NEPA promotes its sweeping commitment to prevent or

eliminate damage to the environment and biosphere' by focusing government and public attention on the environmental effects of proposed agency action." Or again, "NEPA cases have generally required agencies to file Environmental Impact Statements when the remaining governmental action would be environmentally significant." *Id.* at 371, 109 S.Ct. 1851.

Further in *Marsh,* p. 373, 109 S.Ct. 1851, "The parties are in essential agreement concerning the standard that governs an agency's decision whether to prepare a supplemental EIS. They agree that an agency should apply a 'rule of reason.'" ... "Application of the rule of reason thus turns on the value of new information to the still pending decision-making process." The Supreme Court has further described four necessary elements of a reasoned decision: reliance on the factors intended by Congress; consideration of all important aspects of a problem; evidence that supports the decision; and plausibility. *Motor Vehicle Mfrs. Assn. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983).

However, even if an agency's decision making was supported by reason, the APA also finds that the agency cannot change its mind on a whim, even if the record contains support for deciding either way. In other words, once an agency has made a decision in one situation and applied those requirements to one project, when presented with a second similar project, the agency should not suddenly impose new requirements or change the outcome. The idea that the decisions of agencies should not change unpredictably is at the very heart of the "arbitrary" or "capricious" standard, given the plain meaning of those words.[2]

In this case, the Corps decision that another EA is needed is arbitrary in both senses. First, the Corps' assertion that an EA is necessary because the original EIS did not address this type of contamination is, upon a reading of that document, implausible. Second, here the Corps is applying its decision that a new EA is needed when defendants' seek to deposit environmental dredge material in the Pointe Mouillee CDF, but imposed no such requirement when similar environmental dredge materials were accepted for deposit in the Pointe Mouillee CDF. The Corps decision is arbitrary or capricious for both these reasons, as discussed below.

1.

I now turn to the facts that must be considered in determining whether the Corps applied a rule of reason in making its decision that another Environmental Assessment was necessary. In making this analysis, I incorporate by reference the background and factual summary of

---

2. "While [APA] review accords deference to factual determinations supported by substantial evidence, it does not excuse [...] arbitrary decision-making." *Steeltech, Ltd. v. U.S. Env't Prot. Agency,* 105 F.Supp.2d 760, 765–6 (W.D.Mich.2000). This understanding of "arbitrary" is well established and quite common in a wide variety of U.S. jurisprudence. *See, e.g., Overton v. Bazzetta,* —— U.S. ——, 123 S.Ct. 2162, 156 L.Ed.2d 162 (2003) (8th amendment provides prison rules should not be arbitrarily applied to particular inmates); *Franchise Tax Bd. of Cal. v. Hyatt,* 538 U.S. 488, 123 S.Ct. 1683, 155 L.Ed.2d 702 (2003) (choice of law selections should not be arbitrary) *State Farm Mut. Auto. Ins. Co. v. Campbell,* 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003) (14th amendment prohibits imposition of arbitrary punishments on tortfeasors). In *Lawrence v. Texas,* the Supreme Court approvingly quoted a concurring opinion by Justice Jackson: "Conversely, nothing opens the door to arbitrary action so effectively as to allow those officials to pick and choose only a few to whom they will apply legislation." —— U.S. —— at ——, 123 S.Ct. 2472 at 2487, 156 L.Ed.2d 508 (2003), quoting *Ry Express Agency, Inc. v. New York,* 336 U.S. 106, 112–113, 69 S.Ct. 463, 93 L.Ed. 533 (1949).

the *en banc* court, pp. 518–21 of its opinion. As the *en banc* court pointed out on p. 518, Detroit for some time had planned to dredge Conner Creek before that special environmental project[3] was added as a requirement in the Second Amended Consent Judgment. (Case No. 77–71100, *United States v. City of Detroit*, August 3, 2000). The Corps refused to accept the Conner Creek sediment for containment at the Pointe Mouillee CDF without further environmental assessment, citing the elevated concentrations of lead and cadmium in the materials. To the consternation of Detroit, since the Consent Judgment mandated that the contaminated sediment in Conner Creek had to be removed in a short time period, the Corps nonetheless insisted that acceptance of the contaminated sediment at the Pointe Mouillee CDF required that another EA be prepared.

It is important to this analysis to consider what the purpose was in constructing the Pointe Mouillee CDF. In 1974, the United States and the State of Michigan entered into an agreement providing that a facility would be constructed at Pointe Mouillee on state land for the containment of dredged materials from the channels of the Detroit and Rouge Rivers. The intent of the agreement was clear; to carry to out the goals of the Federal Water Pollution Control Act (now known as the "Clean Water Act") with a minimum of harm to the environment.[4] At that time, an Environmental Statement was prepared for the Pointe Mouillee CDF. U.S. Army Corps of Engineers, *Final Environmental Statement; Confined Disposal Facility at Pointe Mouillee for Detroit and Rouge Rivers* (March 1974), Ex. A.

In its discussion of the materials to be disposed of at Pointe Mouillee CDF, that EIS refers to "polluted dredged materials" or "polluted dredge spoil from the Detroit and Rouge Rivers." *Id.* at 39. Heavy metals are discussed under their own subheading, and the report noted, "The EPA mercury criterion was exceeded in averages of all Detroit River samples taken on the U.S. side," and "zinc exceeded the criterion in all samples taken." *Id.* at 40. Appendix 7 contains a more detailed list of the data, which reveals that in one section of the Detroit River, the bottom sediments were so contaminated with a variety of heavy metals that 100% of the samples exceeded EPA criteria for mercury, lead, *and* zinc levels. *Id.* Thus, it is evident that the EIS recognized that the contaminants in the Detroit River system contained a mixture of heavy metals, including lead, at harmful levels.

The EIS also speculated about future dredging sediments, and whether those might be cleaner than the 1970 samples the EIS was based on. Noting that the river systems in major municipal and industrial areas (a description that certainly fits the Detroit River system), "sediments are consistently high in a variety of contaminants," the EIS concluded that "it is doubtful that future sediments will be classed as 'non-polluted.'" *Id.* at 52.

The EIS also examined the potential impact on the Pointe Mouillee area of contaminated sediments. It examined the impact of heavy metals, noting that zinc, mercury, copper and chromium levels in fish were elevated when their environments showed heightened levels of these

3. The project, required by the Second Amended Consent Judgment of August 3, 2000, is a large combined sewer overflow basin capable of containing 30,000,000 gallons of effluent. That project also required the dredging and disposal of 146,000 cubic yards of sediment from Conner Creek.

4. This is also the goal of the Consent Judgment at issue in this case: it too is intended to improve the environmental quality of the area as mandated by federal law.

materials. The report mentioned the risks of leaving "contaminated sediments" exposed to erosion or dissolution, and the potential impact of contaminated runoff. Despite these risks, the EIS concluded, "the disposal of contaminated sediments into a confined area greatly reduces the opportunity for movement of the contaminants into the aquatic system," and "the conclusion to be drawn from the foregoing phenomena is that removal of contaminated sediments...is desirable from an environmental point of view." *Id.* at 86–7.

The Corps later confirmed that "the Environmental Impact Statement for Pointe Mouillee has no specific defined limits of what might be acceptable, provided it is not regulated under TSCA [the Toxic Substances Control Act]," and noted that the dredged materials at issue here would not be "TSCA regulated." (Br. of City of Detroit, Detroit Water and Sewerage Dept. and State of Michigan on Remand, Ex. E.)

Additionally, in 1979, the Corps prepared an EA of the dredging the Detroit River and depositing that dredge material in the Pointe Mouillee CDF. U.S. Army Corps of Engineers, *Environmental Assessment: Dredge Alternatives for the Detroit River, Michigan.* In the project description, the Corps noted that the EPA classified the Trenton, Amherstburg, and the Lower Livingstone–East Outer Channels as contaminated and unacceptable for open water disposal and the Pointe Mouillee CDF was the expected disposal site for these materials. *Id.* at ¶ 1.03, ¶ 1.01.

In ¶ 2.17, the Assessment stated that the Detroit River sediments along the U.S. shoreline showed substantial enrichment in total phosphorus, nitrogen, and chemical oxygen demand, as well as the heavy metals cadmium, chromium, copper, lead, and zinc. *Id.* Minor increases of nickel were also found. *Id.* Despite the fact that these metals would be present in the dredged materials deposited in the Pointe Mouillee CDF, that EA concluded that the dredging would "not significantly affect the quality of the human environment," found that no environmental impact statement was needed, and noted that the course of action described "is in the best public interest." *Id.* at ¶ 5.02–5.03.

This history calls into question the Corps' assertion that the impacts of the dredged materials here, contaminated as they are with heavy metals, has not been sufficiently analyzed environmentally. The very purpose for constructing the Pointe Mouillee CDF was to house sediment from dredging activities. Two different environmental analyses performed by the Corps had addressed potential environmental risks of dredging and disposal of sediment from the Detroit River system at Pointe Mouillee CDF. Those analyses had clearly taken into account that the sediments would likely be contaminated with heavy metals, and would sizably exceed allowable concentrations of a mix of such metals. Given the previous detailed analyses the Corps had prepared, the Corps' contention that the sediment at issue in this case will have an environmental impact that has not already been assessed is simply implausible. That implausibility is further demonstrated by the fact that the Corps has accepted similar material without calling for a new EA at Pointe Mouillee CDF previously, as discussed below.

2.

In 1987, Double Eagle Steel Coating Co. applied for a permit from the Army Corps of Engineers to "dredge and dispose of sediment from the Rouge River Bottom," noting that the site for disposal would be the Pointe Mouillee CDF. (Pet'rs' Br. in Supp. of Mot. for Order to Show Cause, Ex. Z at 1.) The applicant attached the permit from the state to dredge the 40,000 cubic yards of material, which noted that the material was being dredged in order to

comply with a consent decree with the State of Michigan Department of Natural Resources under the Inland Lakes and Streams Act of 1972. *Id.* at 3. That material was accepted for disposal at Pointe Mouillee CDF without any delay for preparation of an EA or SEIS. This demonstrates that before defendants sought to deposit materials dredged for environmental reasons from the same river system, the Corps had approved such activity with no requirement for further environmental study. That the Corps would require an EA before accepting defendants' deposits just three years after approving another permit shows arbitrariness of decision making, to defendants' prejudice.

Moreover, the Corps has previously determined that the disposal of environmental dredge material is permissible at the Pointe Mouillee CDF. In an in-house legal memorandum dated October 1, 1996, the then-Deputy Chief Counsel states, "It is my legal opinion that the Corps is not legally precluded from allowing the disposal of remedial dredged materials into the CDF. . . ." (Ex. QQ of Pet'rs' Br. in Supp. of Mot. for Order to Show Cause.)

Because of the extensive environmental assessment in the record of the depositing dredged materials high in heavy metals in the Pointe Mouillee CDF, and because it is clear that materials dredged for environmental purposes from the same river system were accepted for disposal without new environmental assessment requirements, I find that the Corps decision was arbitrary or capricious. However, because this finding is not strictly necessary to support my order of 2000, which was properly issued under the jurisdiction of the All Writs Act, I do not direct any action by the Corps in relation to this finding.

## CONCLUSION

ACCORDINGLY, IT IS ORDERED that:

The Corps accept dredged materials from Conner Creek for disposal at the Pointe Mouillee Confined Disposal Facility.

IT IS SO ORDERED.