NOT FOR PUBLICATION

FILED

NOV 13 2018

SUSAN M. SPRAUL, CLERK
U.S. BKCY. APP. PANEL
OF THE NINTH CIRCUIT

# UNITED STATES BANKRUPTCY APPELLATE PANEL
## OF THE NINTH CIRCUIT

| | |
|---|---|
| In re: | BAP No. EW-18-1071-FLS |
| MARK KEVIN HANNA and JENNIFER McWILLIAMS-HANNA, | Bk. No. 2:16-bk-03437-FPC |
| Debtors. | |
| ALLAN MARGITAN, | |
| Appellant, | |
| v. | **MEMORANDUM**[*] |
| MARK KEVIN HANNA; JENNIFER McWILLIAMS-HANNA, | |
| Appellees. | |

Argued and Submitted on October 25, 2018
at Pasadena, California

Filed – November 13, 2018

---

[*] This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have, *see* Fed. R. App. P. 32.1, it has no precedential value, *see* 9th Cir. BAP Rule 8024-1.

Appeal from the United States Bankruptcy Court
for the Eastern District of Washington

Honorable Frederick P. Corbit, Bankruptcy Judge, Presiding

———————

Appearances:     Appellant Allan Margitan argued pro se; Ian Ledlin,
Phillabaum Ledlin Matthews & Sheldon, PLLC, argued
on behalf of appellees Mark Kevin Hanna and Jennifer
McWilliams-Hanna.

———————

Before:  FARIS, LAFFERTY, and SPRAKER, Bankruptcy Judges.

**INTRODUCTION**

The parties are neighbors who have been locked in an acrimonious dispute for over six years. In this skirmish, creditor Allan Margitan appeals from the denial of his motion to dismiss Mark Kevin Hanna's and Jennifer McWilliams-Hanna's (collectively, the "Hannas") chapter 11[1] case. Mr. Margitan argued that the Hannas were paying less every month than what their confirmed plan required. The Hannas argued, however, that they had actually paid more than the plan required.

The bankruptcy court had concerns about the Hannas' ability to make future payments but held that, at the time Mr. Margitan sought dismissal, the Hannas were current on their payments and had not

———————

[1] Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532.

2

materially breached their plan. We agree and AFFIRM.

## FACTUAL BACKGROUND[2]

### A.    The underlying property dispute[3]

Mr. Margitan and the Hannas have been neighbors since 2002. The
Hannas own what is known as Parcel 2 of a three-parcel short plat;
Mr. Margitan and his wife own Parcels 1 and 3 and live on Parcel 1.
Parcel 3 is a lakeside property that contains a high-end vacation home that
the Margitans remodeled for use as a rental property. Parcel 3 is benefitted
by a forty-foot wide ingress, egress, and utility easement over the Hannas'
Parcel 2. In 2002, a water-line supplying potable water to the parcels was
installed somewhere in the forty-foot easement.

In 2003, the Hannas obtained a permit from the Spokane Regional
Health District ("SRHD") to construct a septic tank and drain field for
Parcel 2. The Hannas (or their agent) told SRHD, incorrectly, that the
easement was only twenty feet wide. Mr. Hanna knew that the easement
was forty feet wide but never gave his contractor that information. Because
of that error, the Hannas' septic tank and drain field were placed partly

---

[2] We exercise our discretion to review the bankruptcy court's docket, as
appropriate. *See Woods & Erickson, LLP v. Leonard (In re AVI, Inc.)*, 389 B.R. 721, 725 n.2
(9th Cir. BAP 2008).

[3] This is the second appearance of the Hannas and Mr. Margitan before this
Panel. We borrow heavily from the facts stated in our prior decision, *Margitan v. Hanna
(In re Hanna)*, BAP No. EW-17-1238-BJF, 2018 WL 1770960, at *1-2 (9th Cir. BAP Apr. 13,
2018).

within the forty-foot easement in violation of Washington law.

In 2012, the Hannas filed a quiet title action against the Margitans in state court to resolve easement issues for the three parcels. The Margitans filed a counterclaim for intentional interference with their easement and requested that the Hannas remove their sewage system from it.

The Margitans initially prevailed in their litigation against the Hannas. The jury returned a verdict in favor of the Margitans in the amount of $422,934 for damages resulting from the Hannas' intentional interference with the Margitans' easement, including lost rents and emotional distress. The state court entered a judgment on the verdict and ordered the Hannas to remove the existing drain field encroaching on the easement.

The state court later reduced the jury's damages award and entered an amended judgment against the Hannas for $297,834 ("State Court Judgment").

The Hannas appealed the State Court Judgment; the Margitans cross-appealed ("State Court Appeal").

B.     **Bankruptcy proceedings**

The Hannas filed a chapter 11 bankruptcy petition on November 2, 2016. The bankruptcy court granted the Hannas relief from the automatic stay to proceed with the State Court Appeal and allowed them to continue installing a new drain field.

On May 24, 2017, the Hannas proposed an amended chapter 11 plan ("Plan") and disclosure statement. Because Mr. Hanna's monthly income varied, Part 9.3 of the Plan provided that the Hannas would make monthly payments based on a formula. The formula allowed the Hannas to keep the first $7,760 of their wages and commissions per month for living expenses. Of the remaining amount, the Hannas would retain an additional ten percent, while ninety percent would go into an account (the "DIP Agent General Account") from which disbursements would be made. The Plan provided that the Hannas' counsel would administer the DIP Agent General Account and other accounts established under the Plan.

The Hannas proposed to pay the Margitans' claim based on the State Court Judgment, to the extent it was allowed, in full plus interest within sixty months of the "Effective Date of Plan."[4]

The Plan noted that the outcome of the State Court Appeal would determine the amount of the Margitans' claim. The Plan thus provided that, in the meantime, amounts distributable to the Margitans would be held in two special accounts. The first account, the "DIP Agent Margitan Secured Account," would hold proceeds of the sale of assets against which the Margitans held a judgment lien. The second account, the "DIP Agent Margitan Unsecured Account," would hold other funds distributable to the

---

[4] Under Part 2.25 of the Plan, "'Effective Date of Plan' shall mean when the order confirming this Plan becomes final and non-appealable."

Margitans.

The Plan provided for distributions to the Margitans from a combination of sources.

First, Part 9.4 of the Plan provided that the Margitans would receive any available insurance proceeds.

Second, Part 9.6 of the Plan required the Hannas to sell a business (The Tin Cup Café and Country Store, LLC) and associated real property owned by Ms. McWilliams-Hanna and a friend. The Hannas would deposit their half of the sale proceeds of the business and the real property (after payment of the sales costs and a senior lien) into the DIP Agent General Account and the DIP Agent Margitan Secured Account, respectively.

Third, Part 9.14 provided that the Margitans would receive a pro rata share of distributions to unsecured creditors from the DIP Agent General Account. While the State Court Appeal was pending, the Margitans' share would be held in the DIP Agent Margitan Unsecured Account.

Fourth, if the funds from the first three sources were insufficient to satisfy the Margitans' claim within sixty months of the "Effective Date of Plan," the Hannas would list Parcel 2, which was their residence, or a separate parcel of real estate they owned, or both, for sale within forty-five days of the entry of a final, non-appealable judgment in the State Court Appeal and use the net proceeds of the sale to pay the Margitans' claim.

No later than forty-five days after a non-appealable judgment in the

6

State Court Appeal, the Margitans would receive the amounts deposited in the DIP Agent Margitan Secured Account and the DIP Agent Margitan Unsecured Account.

The Margitans filed a motion to dismiss the Hannas' case for bad faith. The bankruptcy court denied the Margitans' motion to dismiss and confirmed the Hannas' Plan on August 9, 2017.

Mr. Margitan appealed the bankruptcy court's decisions to the BAP. Earlier this year, we affirmed. Mr. Margitan further appealed to the Ninth Circuit, where the matter is pending.

## C.     The second motion to dismiss

After the bankruptcy court confirmed the Hannas' Plan, the Margitans filed a second motion to dismiss ("Motion to Dismiss").

The Motion to Dismiss was short and fairly perfunctory. The Margitans presented two grounds for dismissal under § 1112(b)(4). First, they argued that the Hannas failed to comply with the Plan by making a $1,000 insurance deductible payment without prior court approval. Second, the Margitans alleged that the Hannas have "spent excessively . . . in excess of funds designated in the plan" and had not deposited as much as they should have into the DIP Agent General Account or the DIP Agent Margitan Unsecured Account.

In response, the Hannas represented that they were current because, between the petition date and January 23, 2018, they paid $90,739.94 into

the DIP Agent General Account and $32,748.30 into the DIP Agent Margitan Unsecured Account. They argued that there was no substantial continuing loss to or diminution of the estate under § 1112(b)(4)(A); that they had not grossly mismanaged the estate under § 1112(b)(4)(B); that they had not used any cash collateral under § 1112(b)(4)(D); and that they had complied with all orders of the court under § 1112(b)(4)(E).

The Margitans raised additional assertions in their reply to the Hannas' opposition. They claimed that the Hannas disregarded their duties by failing to file required reports. They argued that the Hannas used cash collateral[5] without court approval, including the purchase of a refrigerator, repairs to a truck, payment of college tuition, and the purchase of a new vehicle. They also contended that the Hannas grossly mismanaged the estate by paying for legal services that were not relevant to the bankruptcy case.

## D.    Hearing on the Motion to Dismiss

At the evidentiary hearing on the Motion to Dismiss, the presentation of evidence was often confusing. Among other things, the parties offered various calculations of the amounts due or paid under the Plan that could

---

[5] The Margitans' counsel had earlier argued that the money that should be going into the DIP Agent Margitan Unsecured Account is cash collateral: "The money that goes to my client and the money that under the plan that's earmarked to my client is cash collateral under the Bankruptcy Code." The bankruptcy court was skeptical of this position.

not be reconciled.

## 1.    Payment formula under Part 9.3

The court had to sort through the payment calculations. Mr. Hanna testified that he believed that he had paid the required amounts into the DIP Agent General Account. But Mr. Margitan testified that, using the Plan formula, the Hannas were approximately $15,000 short.

In discussions between the court and counsel, it came to light that the Hannas' counsel had been miscalculating the required monthly deposits. Using a hypothetical month where Mr. Hanna earns $18,000, the court summarized Part 9.3 of the Plan: "So we take this $18,000 dollar amount, subtract the $7,700 dollars, and then 90 percent of that remaining balance is supposed to go into the plan[.]" However, the Hannas' counsel had calculated the monthly deposit backwards by first dividing Mr. Hannas' income into the 90/10 split, **then** subtracting the $7,760 from the portion to be paid into the DIP Agent General Account.[6]

---

[6] According to the court's hypothetical, the Hannas should have paid $9,216 into the DIP Agent General Account:

$18,000
- $7,760
$10,240
x      .9
 $9,216 (with $8,784 to the Hannas)

But using the Hannas' counsel's calculations, the Hannas would have paid only $8,440

(continued...)

## 2. Sufficiency of payments into the DIP Agent General Account

Even when the formula was sorted out, the parties still did not agree whether the Hannas had paid enough into the DIP Agent General Account. On the one hand, the Hannas maintained that they had paid over $92,000 into the DIP Agent General Account; yet the Margitans insisted that the Hannas violated the Plan because they should have paid approximately $50,000 and were $15,000 short.

After a tortured inquiry, the court hit upon the discrepancy in the parties' calculations. The Hannas had begun paying into the DIP Agent General Account before the Plan was confirmed. This resulted in a grand total of $92,000 in payments between May 2017 and January 2018. Conversely, Mr. Margitan's calculations focused exclusively on the postconfirmation time period between September 2017 and January 2018, during which the Hannas were short every month.[7]

---

[6](...continued)
into the DIP Agent General Account:

$18,000
x     .9
$16,200
- $7,760
  $8,440 (with $9,560 to the Hannas)

[7] The Margitans' counsel pointed out that many of the monthly payments into the DIP Agent General Account were made late. Mr. Hanna testified that he was unaware that the Plan required payment by the tenth of each month.

The Margitans argued that it was improper to count preconfirmation payments when considering compliance with the Plan. They also contended that the Plan was unfeasible going forward. The Hannas' counsel once again fell on his sword: "There's been a little bit of a glitch, that was my fault. Fortunately, they front-loaded that, and I've spoken with Mr. Hanna and the problem will be rectified."

### 3. The Hannas' spending habits and "extravagant lifestyle"

The court also heard testimony regarding the Hannas' spending and lifestyle.

Mr. Hanna testified that he paid a $1,000 insurance deductible when his daughter was involved in an automobile accident. His counsel then confirmed that "Mr. Hanna did call me about that before the check was written, and I just didn't think about filing an application . . . ." Counsel said that he would rectify his oversight by making sure that the Margitans and general unsecured creditors "are paid in full before I draw the last $1,000 of allowed fees." Mr. Hanna also testified that he used the insurance proceeds from another vehicle that was involved in an accident and purchased a replacement vehicle without notifying the court.

Mr. Margitan countered that the Hannas were living beyond their means. He had carefully parsed the Hannas' expenditures and pointed out what he considered "lavish" and "excessive" spending. However, the Hannas testified that they did not live lavishly; Ms. McWilliams-Hanna

11

testified that she only spent money on food and that she otherwise "do[es] absolutely nothing." Mr. Hanna stated that the bankruptcy forced the family to forego medical procedures, cancel or suspend their membership in the Spokane Club, curtail vacations, and reduce or eliminate Christmas, birthday, and Valentine's Day gifts.

### 4. The court's decision and additional briefing

The bankruptcy court denied the Motion to Dismiss. The court was concerned that the Hannas were only current on the Plan payments because they had begun making payment prior to confirmation and would likely have trouble going forward. But the court noted that, at that time, the Hannas were current on their payments. The court ordered the Hannas to provide the court with a report of required payments and actual payments through May 2018. It scheduled an additional hearing and advised the parties that it would entertain dismissing the case sua sponte after reviewing the report.

After the hearing, counsel for the Hannas filed a declaration concerning the estate's finances in response to some of the court's questions. He attested that the Hannas deposited $91,822.71 into the DIP Agent General Account through January 2018. He stated that $32,748.39 has been deposited into the DIP Agent Margitan Unsecured Account. Furthermore, attorneys' fees totaled $41,000. Finally, the balance of the DIP

12

Agent General Account on February 28, 2018 was $32,974.58.[8]

The bankruptcy court entered an order denying the Motion to Dismiss. Mr. Margitan, pro se, timely filed a notice of appeal.

## E.    The Hannas' successful state court appeal

On July 24, 2018, the Washington Court of Appeals issued an unpublished disposition reversing the State Court Judgment. The Margitans filed a petition for review before the Washington Supreme Court on October 15.[9]

## JURISDICTION

The bankruptcy court had jurisdiction pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(A) and (O).

## A.    The order is final and appealable.

The Hannas filed a motion to dismiss this appeal, arguing that the

---

[8] On May 15, 2018, the Hannas filed the required report on their compliance. They reported that they should have paid $50,717.68 into the DIP Agent General Account postconfirmation (September 2017 to May 2018), but a $5,959.34 postconfirmation shortfall remained. However, preconfirmation (May to August 2017), the Hannas contributed $47,624.03 to the DIP Agent General Account. As a result, the Hannas have paid a total of $92,382.37, which is $41,664.69 more than the postconfirmation amount due. Moreover, $44,437.89 had been paid into the DIP Agent Margitan Unsecured Account. As far as the docket reveals, the court has not taken any further action.

[9] The record in the bankruptcy court indicates that the Margitans' appellate counsel filed the petition for review twenty-one minutes after the filing deadline. Thus, it is currently unclear whether the Margitans filed a timely petition for review and, if so, whether the Washington Supreme Court will grant review.

order denying the Motion to Dismiss is interlocutory and Mr. Margitan did not seek leave to appeal. A motions panel denied that motion, stating that "the denial of the motion to dismiss, post-confirmation, is sufficiently final for an immediate appeal." Federal courts are always obligated to consider their own subject matter jurisdiction, so we address the finality of the bankruptcy court's order.

Bankruptcy's flexible finality standard dictates that "[o]rders in bankruptcy cases may be appealed immediately 'if they finally dispose of discrete disputes within the larger case . . . .'" *Eden Place, LLC v. Perl (In re Perl)*, 811 F.3d 1120, 1125 (9th Cir. 2016) (citation omitted). Here, where the bankruptcy court already confirmed the Plan, the denial of the Motion to Dismiss meant that the Margitans' motion was "definitively and finally resolved. Resolution of that issue is as final as it will ever be in this case." *Id.* at 1127; *see Vicenty v. San Miguel Sandoval (In re San Miguel Sandoval)*, 327 B.R. 493, 505 (1st Cir. BAP 2005) ("Although orders denying motions to dismiss are generally interlocutory, such an order is final and appealable where a reorganization plan has already been confirmed, since the order effectively ends all litigation on the merits of dismissal.").

In this case, when the bankruptcy court denied the Motion to Dismiss, it also scheduled a further status hearing and indicated that it might dismiss the case sua sponte depending on the result of that hearing. We conclude that the order is final and appealable despite the latter

provision. The court denied the Margitans' motion outright. The fact that the court might decide, based on additional information and subsequent events, to dismiss the case on its own motion does not detract from the finality of the order.

## B.    This appeal is not moot.

Before we consider the merits of this appeal, we must satisfy ourselves that this appeal is not moot despite the Washington Court of Appeals' reversal of the State Court Judgment and the possible reduction of the Margitans' claim to zero.

If we cannot grant Mr. Margitan effective relief, we must dismiss the appeal as moot. "We cannot exercise jurisdiction over a moot appeal." *Ellis v. Yu (In re Ellis)*, 523 B.R. 673, 677 (9th Cir. BAP 2014) (citing *United States v. Pattullo (In re Pattullo)*, 271 F.3d 898, 900 (9th Cir. 2001); *GTE Cal., Inc. v. F.C.C.*, 39 F.3d 940, 945 (9th Cir. 1994)). "[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *City of Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000) (quoting *Cty. of L.A. v. Davis*, 440 U.S. 625, 631 (1979)). Determining constitutional mootness turns on whether "the appellate court can give the appellant any effective relief in the event that it decides the matter on the merits in [its] favor." *Pilate v. Burrell (In re Burrell)*, 415 F.3d 994, 998 (9th Cir. 2005).

Washington state law dictates whether Mr. Margitan has a viable

claim against the Hannas. After the Washington Court of Appeals decides an appeal, a party may file a petition for review within thirty days of the decision (or decision on a motion to publish or motion to reconsider). Wash. R. App. P. 13.4(a). If no one appeals the decision, or the Supreme Court denies a petition for review, the Court of Appeals will issue a mandate terminating appellate review. Wash. R. App. P. 12.5(a), 12.5(b), 12.7(a).

The Margitans filed a petition for review, and the parties confirmed at oral argument that the petition for review is still pending (even though there is a dispute over its timeliness). No mandate has issued. Accordingly, Mr. Margitan's claim is still alive, and he has a legally cognizable interest in the outcome. Mr. Margitan still has the right to maintain this appeal.

Therefore, we have jurisdiction under 28 U.S.C. § 158.

## ISSUE

Whether the bankruptcy court abused its discretion in denying the Motion to Dismiss.

## STANDARD OF REVIEW

We review the bankruptcy court's ruling on a motion to dismiss under an abuse of discretion standard. *Marshall v. Marshall (In re Marshall)*, 721 F.3d 1032, 1045 (9th Cir. 2013); *Sullivan v. Harnisch (In re Sullivan)*, 522 B.R. 604, 611 (9th Cir. BAP 2014). We apply a two-part test to determine whether the bankruptcy court abused its discretion. First, we consider de

16

novo whether the bankruptcy court applied the correct legal standard to the relief requested. Then, we review the bankruptcy court's factual findings for clear error. *In re Sullivan*, 522 B.R. at 611 (citing *United States v. Hinkson*, 585 F.3d 1247, 1261-62 (9th Cir. 2009) (en banc)). We must affirm the bankruptcy court's factual findings unless we conclude that they are illogical, implausible, or without support in the record. *Id.* at 612 (citing *Hinkson*, 585 F.3d at 1262).

## DISCUSSION

**A.    The bankruptcy court has wide discretion to determine whether there is "cause" to dismiss.**

Section 1112(b)(1) provides that "the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause . . . ." As is relevant to this appeal, "cause" includes (for example)[10]:

> (A) substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation;
>
> (B) gross mismanagement of the estate;
>
> . . . .
>
> (E) failure to comply with an order of the court;
>
> (F) unexcused failure to satisfy timely any filing or reporting

---

[10] Section 102(3) provides that "'includes' and 'including' are not limiting. . . ."

17

requirement established by this title or by any rule applicable to a case under this chapter . . . .

§ 1112(b)(4).

The bankruptcy court has broad discretion to determine what constitutes "cause" adequate for dismissal under § 1112(b). *See In re Sullivan*, 522 B.R. at 614; *see also Toibb v. Radloff*, 501 U.S. 157, 165 (1991) (stating that bankruptcy courts have "substantial discretion" to dismiss a chapter 11 case); *Chu v. Syntron Bioresearch, Inc. (In re Chu)*, 253 B.R. 92, 95 (S.D. Cal. 2000) ("Bankruptcy courts have broad discretion to convert or dismiss a Chapter 11 petition for 'cause' shown."); *In re Hoyle*, No. 1:10-bk-01484-TLM, 2013 WL 210254, at *8 (Bankr. D. Idaho Jan. 17, 2013) ("That the itemized grounds are non-exclusive fulfills the Congressional purpose of giving 'wide discretion to the court to make an appropriate disposition of the case when a party in interest requests,' by allowing the court to 'consider other factors as they arise.'" (citations omitted)). If the court determines that "cause" exists, then it must determine whether conversion or dismissal is in the best interest of the creditors and the estate. *In re AVI, Inc.*, 389 B.R. at 729. "The movant bears the burden of establishing by a preponderance of the evidence that cause exists." *In re Sullivan*, 522 B.R. at 614 (citing *StellarOne Bank v. Lakewatch, LLC (In re Park)*, 436 B.R. 811, 815 (Bankr. W.D. Va. 2010)).

**B.     The bankruptcy court did not abuse its discretion in denying the Motion to Dismiss.**

**1.     Monthly payments into the DIP Agent General Account**

Mr. Margitan argues that, as a result of the Hannas' excessive personal spending, they have not fully funded the DIP Agent General Account in violation of a court order (i.e., the order confirming the Plan) and that this failure warrants dismissal under § 1112(b)(4)(E).[11]

Section 1112(b)(4)(E) provides that failure to comply with an order of the court can be "cause" for dismissal. However, the court has wide discretion to determine whether a particular violation or set of violations amounts to "cause." "[T]he circumstances of lack of compliance may be taken into account by the court in determining whether to dismiss or convert the case." 7 Collier on Bankruptcy ¶ 1112.04[6][e] (Richard Levin & Henry J. Sommer, eds. 16th ed. rev. 2018).

As the bankruptcy court determined at the hearing on the Motion to Dismiss, Mr. Margitan focused solely on the amounts contributed to the DIP Agent General Account postconfirmation (approximately $34,000), ignoring the fact that the Hannas had additionally contributed a significant sum preconfirmation (totaling approximately $92,000). The bankruptcy

---

[11] Although Mr. Margitan invoked § 1112(b)(4)(E) for the failure to comply with a court order, § 1112(b)(4)(N) might have been more appropriate, which concerns "material default by the debtor with respect to a confirmed plan[.]" But no one raised this issue (before the bankruptcy court or on appeal), and it is not clear that it would have made any difference in the final analysis.

court did not abuse its discretion in construing the Plan to permit such preconfirmation payments toward the DIP Agent General Account. *See Marciano v. Fahs (In re Marciano)*, 459 B.R. 27, 35 (9th Cir. BAP 2011), *aff'd*, 708 F.3d 1123 (9th Cir. 2013) ("We owe substantial deference to the bankruptcy court's interpretation of its own orders and will not overturn that interpretation unless we are convinced that it amounts to an abuse of discretion." (citation omitted)). While the court had understandable concerns about the Hannas' ability to fund the Plan going forward, the court did not abuse its discretion in determining that, as of the order on the Motion to Dismiss, the Hannas were current.[12]

Mr. Margitan also complains that the Hannas violated the Plan by making payments after the tenth day of each month. Mr. Hanna testified that he was unaware of the deadlines in the Plan, and Mr. Margitan did not identify how he had been prejudiced (because he is not entitled to any distributions until the State Court Appeal is resolved). The court did not abuse its discretion when it determined that these late payments did not

---

[12] Mr. Margitan contends that, if the Hannas are allowed to make preconfirmation payments under the Plan, then the Plan formula should apply to the preconfirmation months. Calculating from the petition date, he represents that the Hannas were $39,116.57 short. Mr. Margitan never made this argument to the bankruptcy court, and there is no reasonable interpretation of the Plan that would support that result.

amount to cause for dismissal or conversion.[13]

Therefore, the court was within its discretion to determine that the Hannas did not violate a court order in a manner that amounted to "cause" under § 1112(b)(4)(E).

## 2. The Hannas' excessive spending and "lavish lifestyle"

Mr. Margitan argues that the Hannas violated the Plan by spending more than the Plan allows. He contends that, between September and December 2017, the Hannas spent $8,548.44 over the formula allowance for their living expenses. He takes issue with the Hannas "living their pre-bankruptcy lifestyle while requesting bankruptcy protection . . . ."

Under § 1112(b)(4)(A), a movant must "establish both (1) a substantial and continuing loss to or diminution of the estate and (2) absence of a reasonable likelihood of rehabilitation. 'The loss may be substantial or continuing. It need not be both in order to constitute cause . . . .'" *L.A. Cty. Treasurer & Tax Collector v. City of W. Covina (In re Hassen Imports P'ship)*, BAP No. CC-13-1019-KiPaD, 2013 WL 4428508,

---

[13] Both sides assume that plan payments were to begin in September 2017, which is the first full month following confirmation on August 9, 2017. However, Part 9.3 requires payment in the first full month "following the Effective Date of Plan[.]" The Plan defines "Effective Date of Plan" as "when the order confirming this Plan becomes final and nonappealable." Mr. Margitan appealed the order confirming the Plan to the BAP and took a further appeal to the Ninth Circuit when we ruled against him. That appeal remains unresolved. This suggests that the Effective Date of Plan has not occurred yet, because the order confirming the Plan is not yet final and unappealable. But we do not decide this issue because no one has argued this point.

at *13 (9th Cir. BAP Aug. 19, 2013) (citations omitted). The asserted loss or diminution must "'materially negatively impact the bankruptcy estate and the interest of creditors,' or [cause] 'dwindling liquidity, or illiquidity resulting in unpaid postpetition debts which usually constitute administrative expenses that will take priority over prepetition claims.'" *Id.* (citations omitted). "To determine the existence of a continuing loss to, or diminution of, the estate, the bankruptcy court must look beyond financial statements and fully evaluate the present condition of a debtor's estate." *Id.*

Nothing in the Plan dictates what kind of "lifestyle" the Hannas may enjoy. The Plan simply requires the Hannas to pay into the accounts an amount determined under the Plan formula. As long as the Hannas pay the amounts mandated by the Plan, they are free to do whatever they wish with the income allocated to them. The bankruptcy court did not abuse its discretion in ruling that the Hannas' spending did not amount to "cause" under § 1112(b)(4)(A).

3. **Quarterly payments into the Margitan Unsecured Account**

Mr. Margitan also contends that the Hannas have failed to fund the DIP Agent Margitan Unsecured Account. He notes that, if the Hannas cannot fund the accounts sufficiently, they must liquidate real property. He argues that requiring him "to wait for personal property to be liquidated will cause further harm to Creditor/Appellant. . . . [T]he estate will never recover from excess spending."

22

This argument fails. The Plan specifies in detail that the Hannas need not sell any of their real property unless and until it appears that the Plan funding from other sources will be insufficient to pay the Margitans' allowed claim in full within sixty months of the Effective Date of Plan. The Plan does not require the Hannas to sell property simply because the Margitans are afraid that the Hannas might not be able to make future Plan payments.

### 4. Mismanagement of the estate

Mr. Margitan next presents a laundry list of alleged instances of the Hannas' gross mismanagement of their estate under § 1112(b)(4)(B). None of these is persuasive.

"The § 1112(b)(4)(B) inquiry typically focuses on how the debtor or the debtor's agents have managed the estate's assets or business during the pendency of the chapter 11 proceeding and how they have reported and handled, postpetition, income and expenses derived from the assets/business." *Grego v. U.S. Tr. (In re Grego)*, BAP No. EC-14-1067-KuPaJu, 2015 WL 3451559, at *5 (9th Cir. BAP May 29, 2015) (citations omitted). "Bankruptcy courts have found gross mismanagement in cases where debtors have not maintained an effective corporate management team, failed to follow through on their fiduciary duties under chapter 11, including obtaining credit or financing outside the ordinary course of the debtor's business, filed monthly reports without closely monitoring them[,]

23

or where the business lacks effective management." *Kingsway Capital Partners, LLC v. Sosa*, 549 B.R. 897, 904 (N.D. Cal. 2016) (citations omitted).

Mr. Margitan alleges that the Hannas wasted estate resources by paying their counsel for unnecessary work.[14] But aside from bald statements that these tasks were unnecessary, he fails to explain how they constituted gross mismanagement of the estate. He also fails to provide citations to the record for certain billing entries, so we are unable to review those events.

Additionally, Mr. Margitan faults the Hannas' counsel for spending forty-three hours redacting subpoenaed documents. However, the Hannas point out that the entry for 42.22 hours (in a single day) in their counsel's billing statement was an obvious typo. In any event, their counsel did not charge for this time entry and indeed indicated that they billed "0.00 n/c."

Mr. Margitan also argues that the Hannas have not filed disclosure statements related to The Tin Cup Café, preconfirmation monthly financial balance sheets, and postconfirmation quarterly reports. But the Hannas point out that The Tin Cup Café is not a debtor in this case and there is no evidence that the Hannas received any income from The Tin Cup Café.

---

[14] We note that the bankruptcy court had previously stated that much of the attorneys' fees incurred was a result of litigation caused by Mr. Margitan's animosity toward the Hannas: "You have made this litigation very expensive . . . . I have concluded that much of the attorney's fees that were incurred in this case were the result of your animosity towards your neighbor."

Moreover, the Hannas' reports were filed within the months they were due and were never deemed insufficient. The bankruptcy court was within its discretion to determine that there was no "cause" to dismiss.

Mr. Margitan argues that the Hannas failed to report that they sold a vehicle after an automobile accident; purchased a replacement vehicle with the insurance proceeds; and used estate funds to repair a second vehicle. The Hannas ultimately addressed these issues to the bankruptcy court's satisfaction. The replacement vehicle was entirely purchased with the insurance proceeds and did not require any estate funds; the Hannas subsequently amended their schedules. The Hannas' counsel took responsibility for the $1,000 insurance deductible paid on the second vehicle and represented that he would rectify the situation by withholding $1,000 from the payment of attorneys' fees until all creditors are paid in full. The bankruptcy court was satisfied that this was not gross mismanagement, and we discern no abuse of discretion.

5.    **Res judicata and collateral estoppel**

Finally, Mr. Margitan raises two arguments that make little sense in this context. It also does not appear that he raised these arguments before the bankruptcy court. *See Yamada v. Nobel Biocare Holding AG*, 825 F.3d 536, 543 (9th Cir. 2016) ("Generally, an appellate court will not hear an issue raised for the first time on appeal.").

He argues that the Plan is "res judicata." It is true that an order

25

confirming a plan has preclusive effect, but that is irrelevant here. The Hannas do not deny that the Plan is binding upon them. Rather, the question is what the Plan requires the Hannas to do, whether they have done those things, and what consequences should flow from any failure. Preclusion principles have nothing to say about these questions. Further, if anyone is attempting to relitigate the Plan confirmation issues, it is Mr. Margitan, not the Hannas. Both the bankruptcy court and this Panel rejected all of those contentions, and we will not reconsider them here.

Even more confusingly, he argues that equitable estoppel "prohibits the Debtor[s] from failing to comply with a Court Order." Equitable estoppel serves to prevent a party from asserting a particular position. It has no applicability to this case.

## CONCLUSION

The bankruptcy court did not abuse its discretion. We AFFIRM.